ALLEN, Judge.
The defendant, A. M. Minton, appeals from a judgment and sentence entered against him after a jury found him guilty on the second count of an information charging that the appellant did, on certain dates, unlawfully aid and assist in setting up, promoting or conducting a lottery or lottery drawing for money, commonly known as Cuba or Bolita, by receiving or taking into his possession money for chances sold on a lottery. The jury found the defendant not guilty on the first and third counts of the information.
The appellant moved for a bill of particulars, paragraph 6 of which requested the State to describe the manner or means by which the defendant aided or assisted in setting up, promoting or conducting a lottery. Paragraph 10 of appellant’s motion requested that the State describe the type of records alleged to have been kept by defendant on the sale of chances on a lottery. On order of the court, the county solicitor answered three of the requested questions. The answer to paragraph 6 of defendant’s motion stated:
"The defendant aided or assisted in setting up, promoting or conducting a lottery by receiving lottery tickets or other records showing that chances had been sold on a lottery.”
In answer to paragraph 10 of the defendant’s motion for bill of particulars, the State answered as follows:
“The type of records alleged to have been kept by the defendant were, to the best of the State’s knowledge, lottery tickets, adding machine tapes, and various types of tally sheets.”
We shall first consider whether the evidence in this case was sufficient to permit the jury to find, as it did, that the defendant "aided or assisted in setting up, promoting, or conducting a lottery by receiving lottery tickets or other records showing that chances had been sold on a lottery.”
We are of the opinion, after a study of all the testimony in the record, that the State adduced evidence sufficient to justify the jury’s verdict against the defendant,. State’s witness, George Thomas, on page 7 of the reporter’s transcript of testimony, testified as follows:
“Q. Did you have occasion to talk with the defendant at the ball park in an automobile? A. I met him one time in an automobile and another fellow was in the car, and what I had wrapped up in the newspaper, I handed it to the fellow next to him.
“Q. The defendant Minton was in the automobile at that time? A. Yes, sir.
*145 “Q. What was in the newspaper that you handed to him? A. Bolita slips.
“Q. Where did you hand him these Bolita tickets at that time? A. That was up there by the ball park, by the white ball park.
* * * * * *
“Q. Referring to that specific day that you handed this package of Bolita tickets to him, what day of the week was it? A. On a Saturday.
“Q. What happened on that particular Saturday, what did you do after you gave the Bolita tickets to him in the automobile? A. After the number came out, Lou called me and told me what the number was and I disre-member now how it was picked up. I don’t know exactly which way it was, but I did not hear no more from him.
* * * * * *
“Q. Juke, isn’t it true that Minton has been to your house a couple of times? A. Yes, sir.”
Another State’s witness, beginning on page 65 of the transcript of testimony, was asked the following questions and gave the following answers:
“Q. Did you go into any type of business or operation with the defendant Minton in 1954? A. Yes, I became involved with Mr. Minton about the Spring of 1955, the first part of 1955.
“Q. What sort of business did you become involved in with the defendant, Minton? A. He had some people bringing in packages from the west part of town and asked me to pick them up.
“Q. He asked you to pick them up —who did you pick them up from ? A. Two people, — one was Sam Pompey, Jr., and the other was George Thomas.
“Q. Also known as Jukin’ George? A. That’s right.
“Q. As near as you recall, this was the Spring of 1955? A. About that time.
"Q. Did Mr. Minton instruct you to pick up these packages? A. That’s right.
“Q. When you first started, did you know what was in them? A. Not at first, no, but later on, I found out they were tickets.
“Were you being paid by Mr. Minton to pick up these packages? A. I received a slight compensation. At first, it was a small amount and later it. became larger.
“Q. Approximately when did you first learn what was in these packages ? A. About the third or fourth time the deliveries were made.
“Q. When were these deliveries made? A. They were usually made at the end of the week about Saturday.
“Q. Did you pick up packages from anyone other than Pompey and Thomas? A. No, I don’t recall right now,
“Q. Were you instructed by the defendant to pick up packages from anyone other than the two just named? A. No.
******
“Q. What type of operation, if you know, was the defendant engaged in in the spring of 1955 and summer of 1955? A. What type of business Mr. Minton was operating—
“Q. Yes, at the Dixie Court Hotel during the time I mentioned ? A. He was operating a lottery known as Cuba or Bolita.”
Finally, the last quoted witness testified, as appears on page 73 of the transcript, as follows:
*146 “Q. Did you ever turn over any money from this operation to Mr. Minton himself? A. Yes, he would come in Monday, the first part of the week after the previous week’s operation and gather up the results.
“Q. Did you, at that time, then give him money? A. Yes, I gave him the results and money if there was some left.
“Q. Did the money and tickets come in at the same time from Pompey and Juke? A. The receipts and money or sales of tickets came in Saturday morning, hut the money was received after the results were issued so they would know how much to either receive or pay.”
The above quotations did not constitute all of the testimony against the defendant, but shows, in the opinion of the court, sufficient evidence to support the bill of particulars complained about by the defendant.
The appellant, in his point 7, contends that the written report of the grand jury should have been made available for the purpose of impeachment of State witnesses. The appellant filed a written motion to inspect the entire grand jury report prior to trial, and the motion was denied by the trial judge. We find no error in this ruling. The purpose of the appellant’s motion, apparently, was to see the grand jury’s report in order to determine who the State witnesses would be. Subsequently, the appellant received a list of all the State witnesses when he made a request for it, so we do not consider as error the court’s denial of the written motion.
We next advert to the motion made by the defendant in the midst of the trial. Again we quote from the trial proceedings, from page 24 of the testimony, as follows:
“Q. But you did testify before the Grand Jury? A. Yes, sir, that’s right.
“Mr. Ives: At this time, I am going to make a motion that before further cross-examination that defense counsel be allowed to inspect the testimony of the witness before the Grand Jury prior to concluding my cross examination so that I can determine whether he is testifying to the same thing at this time as he did then. * * *
% ifc ‡ ‡ ijs
“The Court: The motion will be denied.”
When the proper predicate is shown, a defendant is entitled to inspect the testimony of a witness given before a grand jury. See State ex rel. Brown v. Dewell, 1936, 123 Fla. 785, 167 So. 687; Trafficante v. State, Fla.1957, 92 So.2d 811.
However, under the facts appearing in this record, we do not find reversible error in the lower court’s refusal to grant defendant’s oral motion for permission to inspect the testimony given before the Grand Jury by the witness being cross-examined.
In addition to the questions above discussed, appellant argues eight other points. We have given due consideration to these additional points and conclude that no error on the part of the trial judge is shown thereby.
There being no error in the judgment and sentence appealed from, they should be affirmed.
Affirmed.
KANNER, C. J., and SPOTO, I. C., A. J., concur.