The **MEADOW BROOK NATIONAL BANK**

v.

**Sam J. RECILE and Wilson P. Abraham.**

**Civ. A. No. 67–341.**

United States District Court
E. D. Louisiana,
New Orleans Division.

April 28, 1969.

Jerry A. Brown, D. D. Howard, Monroe & Lemann, New Orleans, La., for The Meadow Brook Nat. Bank.

James J. Morrison, New Orleans, La., for Sam J. Recile.

Moise S. Steeg, Jr., Steeg & Shushan, New Orleans, La., for Wilson P. Abraham.

HEEBE, District Judge:

This diversity suit, while appearing to be a run-o*f*-the-mine suit on a promissory note, is steeped with intriguing and unique questions of vast importance to the lending institutions of this state. The real problem is usury, an ancient one, and the solution is unexpectedly difficult under Louisiana law. The tale, though, is a remarkably familiar one.

On April 6, 1966, Sam J. Recile and Wilson P. Abraham endorsed a negotiable promissory note in the face amount of $4,200,000, which was executed that same day by Bourbon Kings Hotel Corporation, as maker, payable to the order of The Meadow Brook National Bank (now The National Bank of North America) in 180 monthly installments of $35,154 on the first day of each month commencing on June 1, 1966, except that the final payment of the entire indebtedness, if not sooner paid, was due and payable on May 1, 1981. The face amount of the note included a 5% discount, the Bank advancing only $3,990,-000. The note provided for 8% interest on the face amount of the note *from date* until maturity, and 8% interest on all matured but unpaid sums. The note contained a typical acceleration clause and fixed attorneys' fees at 10% in the event resort to attorneys for collection was necessary. A first mortgage on the Bourbon Orleans Hotel in New Orleans secured the note.

The maker was surprisingly quick to default, failing to make the second payment on July 1, 1966. Motivated by its own selfish interests, the second mortgagee intervened and made certain payments on the first mortgage to stave off the Bank's threatened foreclosure. This burden, obviously onerous, soon broke the second mortgagee's spirit, and the monthly installment due on December 1, 1966, was never paid nor were any monthly installments paid thereafter. The plaintiff Bank, payee and holder of the note, then exercised its option under the acceleration clause and demanded payment of the entire indebtedness. Meadow Brook National Bank then instituted this suit seeking to recover against the endorsers on the note, Recile

and Abraham.[1] Subsequently, Recile was adjudicated a bankrupt by a judgment of January 12, 1968, in proceedings before this Court under Chapter XII of the Bankruptcy Act entitled "In the Matter of Sam James Recile, Debtor, In Proceedings for a Real Property Arrangement," and numbered Bankruptcy No. 67–702. A myriad of legal issues emerged from these simple facts.

### A. *Stay of Suit as to Recile*

On the morning of the trial, a motion was filed on behalf of defendant Recile suggesting that he was an improper party defendant and requesting that the suit be stayed as to him because he had been adjudged a bankrupt and the bankruptcy proceedings were still pending. We took the motion under advisement and proceeded with the trial. We now deny the motion.

■ Section 11(b) of the Bankruptcy Act, 11 U.S.C. § 29(b), provides:

"The court may order the receiver or trustee to enter his appearance and defend any pending suit against the bankrupt."

The defendant Recile requests us to substitute the bankruptcy trustee as defendant in this suit. We have no power to do so. The "court" referred to in § 11(b) is the bankruptcy court which has the exclusive power to order the trustee to defend a suit such as this.

Rhodes v. Elliston, 29 F.2d 737 (5th Cir. 1928). This is implicit in the whole tenor of Collier's discussion of this provision. 1 Collier on Bankruptcy ¶ 11.09 (14th ed.). We are simply without authority to order the trustee to defend this suit. He is subject only to the authority of the bankruptcy court. This aspect of the motion, therefore, should have been directed to the bankruptcy court. If the trustee himself had filed a motion to intervene in this suit, we, of course, would then have power to grant the motion, provided he had approval of the bankruptcy court. But the trustee did not file such a motion, and Recile is the proper defendant.

■ The aspect of the motion requesting a stay is governed by § 11(a) of the Bankruptcy Act, 11 U.S.C. § 29(a), which provides in pertinent part:

"A suit which is founded upon a claim from which a discharge would be a release, and which is pending against a person at the time of the filing of a petition by or against him, shall be stayed until an adjudication or the dismissal of the petition; *if such person is adjudged a bankrupt, such action may be further stayed until the question of his discharge is determined by the court after a hearing \* \* \*.*"

Collier states the purpose of this section is primarily for the benefit of the bank-

---

l. The plaintiff was prevented from instituting suit against the corporate maker of the note by virtue of a stay order dated December 8, 1966, in the corporate reorganization proceedings of the Bourbon Kings Hotel Corporation's parent corporation, Southern Land Title Corporation, which proceedings were entitled "In the Matter of Southern Land Title Corporation, Debtor Corporation" and numbered Bankruptcy No. 66–1015. Those proceedings, instituted upon a voluntary· petition for corporate reorganization, were subsequently dismissed but the plaintiff was still barred from instituting suit against the corporate maker of the note by virtue of a stay order issued immediately thereafter in the corporate reorganization proceedings entitled "In the Matter of Southern Land Title Corporation, Debtor, in Proceedings for the Reorganization of a Corporation" and numbered Bankruptcy No. 67–135, which proceedings were instituted upon an involuntary petition for corporate reorganization. Prior to the date of the reorganization petitions, Exchange National Bank of Chicago, the holder of a note in the face amount of $583,914.51, secured by a second mortgage against the Bourbon Orleans Hotel, instituted foreclosure proceedings against the Hotel on August 23, 1966, in the Civil District Court for the Parish of Orleans, by filing a petition for executory process in proceedings numbered 452–838 and entitled "Exchange National Bank of Chicago v. Sam Recile, Bourbon Orleans Apartment Hotel, Southern Land Title Corporation, and Bourbon Kings Hotel Corporation, et al.

rupt to avoid being harassed in two courts at the same time with regard to the same debt. 1 Collier on Bankruptcy ¶ 11.02 (14th ed.). Once a person is adjudged a bankrupt as Recile was, a motion for a stay is directed to the discretion of the court. 1 Collier on Bankruptcy ¶ 11.06 (14th ed.). The exercise of this discretion is governed by a consideration of the equities involved. The very lateness of the motion, coming on the day of the trial, cast the equities against the defendant Recile. The harassment, if any, certainly could not have been very great if it did not prompt Recile to file the motion sooner. The trial itself took only an hour and certainly could not have constituted harassment in itself. Moreover, since this suit was filed against Recile *and* Abraham, the trial had to proceed even if it were stayed against Recile. A stay would thus only necessitate a duplication of effort, time, and expense by the plaintiff and the courts when the claim against Recile was presented in the bankruptcy proceedings. By denying the stay, we avoid this needless waste under circumstances where no real harassment of which the defendant can complain exists. We are fully aware that a judgment *in personam* against the bankrupt is not absolutely *binding* upon the trustee in bankruptcy as to the validity of the claim when, as here, the trustee is not a party to the suit and has not been directed by the bankruptcy court to defend the suit. Coleman v. Alcock, 272 F.2d 618 (5th Cir. 1959); Rhodes v. Elliston, 29 F.2d 737 (5th Cir. 1928); 1 Collier on Bankruptcy ¶ 11.09 (14th ed.). However, the *probabilities* are that the trustee in bankruptcy will accept this judgment as proof of the claim. Hence, our refusal to grant this "thirteenth hour" delaying tactic will most likely result in future economies to the plaintiff, the public, and the bankrupt's creditors.

### B. *Character of Defendants' Liability*

The parties being unable to agree as to the character of the defendants' liability on the note, and this having a direct bearing on the other issues raised herein, we think it important to determine this question before journeying further. The defendants claim to be merely accommodation endorsers, whereas the plaintiff insists they are not accommodation endorsers but rather are liable *in solido* with the maker of the note. Relying on § 29 of the Negotiable Instruments Law, La.Stat.Ann. 7:29, and Gaspard v. Lachney, 92 So.2d 277 (La. App.1957), the plaintiff correctly claims that an accommodation endorser is one who merely lends his name to the instrument without receiving any consideration in return. Continuing, the plaintiff asserts that § 24 of the NIL, La. Stat.Ann. 7:24, establishes a presumption that every person whose signature appears on a note has become a party thereto for value. Therefore, the plaintiff argues, the burden is upon the defendants to establish that they did not receive any consideration and, therefore, were only accommodation endorsers. Concluding, the plaintiff argues that since the defendants produced no evidence on this issue, we must find that they are not accommodation endorsers and are therefore solidarily liable with the maker on the note. The defendants agree, as do we, that they carry the burden of establishing their status as accommodation endorsers. They request us, however, if their status as accommodation endorsers is important, to reopen the trial in order to permit them to adduce additional evidence establishing their status as accommodation endorsers.

As far as this case is concerned, it is immaterial whether the defendants are classified as accommodation endorsers or plain endorsers because, regardless of their classification, they are liable *in solido* [2] with the maker of the note. On its face, the note contains a promise to pay by the Bourbon Kings Hotel Corporation. The note does not contain a promise to pay by anyone else. The defendants signed the back of the

---

2. In Louisiana liability *in solido* is similar to joint and several liability at common law.

note. By virtue of §§ 63 and 17(6) of the NIL, La.Stat.Ann. 7:63, 17(6), it is clear that the defendants are endorsers and not comakers of the note. The liability of endorsers, whether accommodation endorsers or not, is secondary; it is conditioned upon presentment for payment, dishonor, and notice of dishonor. The endorsers, however, may waive these conditions, and when they do so, they become primarily liable on the note insofar as the holder is concerned even though they are entitled to recourse against the maker if they are forced to pay the note. Atkins v. Dixie Fair, 135 La. 622, 65 So. 762 (La.1914); Central Sav. Bk. & Tr. Co. v. Oilfield Supply & S. Mat. Co., 202 La. 787, 12 So.2d 819 (La.1943); New Ulm State Bk. v. Moore, 185 So.2d 367 (La.App. 1966); Seelig v. Brusso, 121 So.2d 28 (La.App.1960). This only means that the holder of a negotiable instrument may proceed directly against an endorser who waives these conditions without first seeking recovery against the maker of the note. Such an endorser, then, is said to be "primarily" liable because the holder is free to proceed against him on the instrument without even attempting to recover from the maker. Yet, vis-a-vis the maker, such an endorser is still only secondarily liable inasmuch as he has a right of recourse against the maker.

These principles are not altered merely because one may be only an accommodation endorser. As pointed out by the Louisiana Supreme Court in William D. Seymour & Co. v. Castell, 160 La. 371, 107 So.2d 143 (La.1926), many transactions would never be effected if it were not for the accommodation endorsements; not only would it shock the business world to preclude recovery against an endorser merely because he was an accommodation endorser, but it would also frustrate the very purpose of securing the accommodation endorsement and would very quickly stifle numerous commercial transaction.

The note before us contains the following clause:

"All parties hereto, whether maker, endorsers, guarantors, or sureties, severally waive presentment for payment, demand, notice of nonpayment, protest and all pleas of division and discussion, and agree that the payment hereof may be extended from time to time, one or more times, without notice, hereby binding themselves in solido, unconditionally and as original promisors for the payment hereof, in principal, interest, costs and attorney's fees."

Thus, not only did the defendants render themselves primarily liable on the note by waiving the conditions limiting them to secondary liability insofar as the holder is concerned, but they also expressly obligated themselves *in solido* with the maker of the note. Bonart v. Rabito, 141 La. 970, 76 So. 166 (La.1917), long ago settled the principle in Louisiana that a clause in a note similar to the one above obligates even an accommodation endorser to solidary liability with the maker of the note. The Louisiana lower courts have consistently adhered to this principle. *E. g.,* House of Loans, Inc. v. Matassa Motor Co., 115 So.2d 210 (La.App.1959); W. F. Brown & Sons, Inc. v. Easterly, 4 So.2d 73 (La.App. 1941); Continental Bk. & Tr. Co. v. Bouterie, 169 So. 812 (La.App.1936); Continental Bk. & Tr. Co. v. Simmons, 177 So. 384 (La.App.1937). However, as far as we have been able to determine, it makes little difference whether the endorsers are primarily liable or are liable *in solido* with the maker. In either case, the above decisions indicate that the practical effect is the same; the holder can resort to the endorser without first seeking recovery against the maker, and the endorser is entitled to recourse against the maker in the event that he is forced to pay the note. In any event, even assuming the defendants to be only accommodation endorsers, it is nevertheless clear that they are liable *in solido* with the maker on the note. This renders the question of whether they are only accommodation endorsers immaterial, and hence we need not de-

cide whether we should reopen the trial to take further evidence on that academic issue.

## C. Release from Liability

Defendant Abraham contends that he was released from liability on the note due to an unauthorized extension of time granted by the plaintiff. The facts supporting this defense are simple. The date the note was executed, April 6, 1966, Mr. Douglas H. Ball, a senior vice president of the plaintiff bank, wrote a letter to the second mortgagee of the Bourbon Orleans Hotel in which he agreed that the Bank would give the second mortgagee twenty days' notice prior to instituting any foreclosure action in case of default on the first mortgage note.[3] Abraham contends that this binding agreement extended the maturity of the note, and since he had no knowledge of it, did not consent to it, and objected to it upon learning about it, it released him from liability on the note.

Abraham relies upon § 120 of the NIL, La.Stat.Ann. 7:120. That section is inapplicable by virtue of the fact that it applies only to persons secondarily liable to the holder of the note, and the defendant Abraham is primarily liable to the holder. Continental Bk. & Tr. Co. v. Bouterie, 169 So. 812 (La. App.1936); Charbonnet v. Reliance Finance Corp., 143 So. 104 (La.App. 1932). An equal and even more obvious answer to Abraham's contention is the clause quoted above in which the endorsers expressly agreed that "payment may be extended from time to time, one or more times, without notice." This surely precludes Abraham from now asserting as a defense that an extension of time was granted without his consent, thereby releasing him from liability. Bonart v. Rabito, 141 La. 970, 76 So. 166 (La.1917); Succession of Gravolet, 193 So. 218 (La.App.1940). However, Abraham argues that this clause is limited to extensions granted to the *parties* to the note and does not apply to extensions granted to third parties. This rhetorical argument falls for the simple reason that the time for the payment of a note cannot be extended unless it is extended to one or more of the parties to the note. Unless the time for payment is extended to a party to the note, no real extension of the time for the payment of a note can occur, for the holder has in no way modified the terms of the note itself or his rights thereunder, regardless of the fact that he may have entered into a contract with a third party which would be violated by exercising his rights under the note, such as, for example, contracting with a third party not to foreclose on the security. Notwithstanding any inconsistent contracts with third parties, the time of the note remains the same unless it is modified by a subsequent agreement with the parties to the note. Until this is done, the note is due and payable according to its original terms. Thus, in our opinion, the April 6 letter of Mr. Ball did not extend the time of payment of the note. Moreover, if, by virtue of a third-party beneficiary theory or some other theory, it did vest an enforceable right in the maker of the note extending the time of payment, we think it would activate the clause consenting to extensions of time and thus preclude Abraham from raising it as a defense. The apparent harsh result of this analysis is fully ameliorated by the principle that the holder cannot voluntarily release or impair the value of the security, which is the crux of Abraham's argument and which is more fully discussed below.

Essentially, the heart of Abraham's argument is that his rights of subrogation were prejudiced by the Bank's failure to enforce its security rights against the hotel immediately and by granting the second mortgagee the opportunity to cure the default. This enabled the second mortgagee to keep the first mortgage

---

3. Mr. Ball wrote a letter on the same day to the maker of the note stating that the bank would give the maker ten days' notice prior to declaring the note in default or instituting a foreclosure action. The defendants do not claim that this operated as a release of their liability on the note.

current and to institute foreclosure proceedings on its own mortgage which was in default. This resulted in prejudice to him, Abraham argues, because it would force him to bid the price of the second mortgage at the judicial sale, as well as the price of the first mortgage, in order to maintain his right of subrogation, whereas if the first mortgagee foreclosed immediately upon default, Abraham would only have to bid the price of the first mortgage to protect his right of subrogation to the security.

■ It is, of course, clear that the holder of a negotiable promissory note is not required to proceed against the defaulting maker or the security on the note prior to instituting suit against an endorser who is primarily liable on the note. Atkins v. Dixie Fair Co., 135 La. 622, 65 So. 762 (La.1914); Succession of Gravolet, 193 So. 218 (La.App. 1940); Continental Bk. & Tr. Co. v. Bouterie, 169 So. 812 (La.App.1936). If, as pointed out above, the endorser is required to pay the note, he is entitled to recourse against the maker. And if the note was secured, the endorser then succeeds to the rights of the holder against the security. Without this right of subrogation many endorsements would undoubtedly never be obtained, and it would certainly frustrate the legitimate expectations of numerous endorsers if the holder of the note, at his own fancy, were able to release or impair the value of the security. Consequently, the holder of the note has an obligation to preserve the security intact, and if he voluntarily releases or impairs the value of the security, he loses his recourse against the endorser to the extent of the value of the security so released or impaired, even though the endorser is primarily liable to the holder and liable *in solido* with the maker. Central Sav. Bk. & Tr. Co. v. Oilfield Supply & S. Mat. Co., 202 La. 787, 12 So.2d 819 (La.1943); House of

Loans, Inc. v. Matassa Motor Co., 115 So.2d 210 (La.App.1959); Glass v. McLendon, 66 So.2d 369 (La.App.1953); United Loan Corp. v. Kyer, 54 So.2d 891 (La.App.1951). Thus, we need only determine whether the plaintiff's agreement to allow the second mortgagee twenty days to cure any defaults impaired Abraham's right of subrogation.[4]

■ Mere delay by the holder in enforcing his security rights does not, without more, release the endorser because, standing alone, it is not prejudicial. House of Loans, Inc. v. Matassa Motor Co., 115 So.2d 210 (La.App.1959); Succession of Gravolet, 193 So. 218 (La. App.1940). Thus, the agreement by itself did not operate as a release of Abraham. The question then becomes whether delay by the holder in enforcing his first mortgage is prejudicial to the subrogation rights of the endorser when, as here, the second mortgagee is permitted to keep the first mortgage current and forecloses on the secured property during the interim. This question must also be answered in the negative. Under Louisiana law, a seizing creditor is unable to acquire the seized property at a judicial sale unless a bid is acquired at the auction which is sufficient to satisfy all mortgages, liens, and privileges superior to that of the seizing creditor. Louisiana Code of Civil Procedure, Articles 2337, 2338, 2374; Comment, "Execution Sales," 21 La.L.Rev. 235, 239, 241 (1960). While it is true, as contended by Abraham, that in order for him to acquire the property at the foreclosure instituted by the second mortgagee, he must bid in the price of the second as well as the first mortgage, the argument simply overlooks the fact that there would be absolutely no necessity for the defendant to do that as far as protecting his rights on the note is concerned because the note must necessarily be satisfied by the sale under Louisiana

---

4. As noted above, at the same time the bank granted the second mortgagee twenty days to cure any defaults, it granted the maker ten days in which to cure any defaults. Thus, if it were important, the precise issue would be whether the ten additional days granted to the second mortgagee impaired Abraham's right of subrogation.

law and the defendant thus released from liability. The key triggering this defense is prejudice to the endorser's right of subrogation resulting from the holder's release or impairment of the value of the security. In this case, the value of the security was in no way impaired, and the defense falls. We are certainly not confronted with the situation which existed in Central Sav. Bk. & Tr. Co. v. Oilfield Supply & S. Mat. Co., 202 La. 787, 12 So.2d 819 (La.1943), where the holder of a note secured by an allegedly superior mortgage completely failed to intervene in a foreclosure action instituted by one owning an allegedly inferior rent privilege. In the case at bar, it appears that the defendants were actually benefited by the holder's conduct inasmuch as the payments on the note by the second mortgagee reduced the total liability of the endorsers on that note. Having found and concluded that defendant Abraham was not released or discharged from liability on the note, we need not consider the contention that the release of Abraham operated as a release of Recile.

#### D. *Usury*

#### 1. *Purchase or loan?*

The most complex defense to this suit is that the note was usurious. The plaintiff attempts to cut this defense short by contending that it did not make a loan to the Bourbon Kings Hotel Corporation, but rather it merely purchased paper already in existence. If, as plaintiff contends, the transaction was a *sale* of an already existing corporate obligation rather than a *loan* to the corporation, the usury laws would not be applicable for usury is not considered applicable to the well-recognized financial practice of commercial discounting. Lafayette Royale Apts., Inc. v. Meadow Brook National Bank, 397 F.2d 378 (5th Cir. 1968); Lubbock Hotel Co. v.

Guaranty Bk. & Tr. Co., 77 F.2d 152 (5th Cir. 1935); Medical Arts Bldg. Co. v. Southern Finance & Development Co., 29 F.2d 969 (5th Cir. 1929); People's Bk. & Tr. Co. v. Fenwick Sanitarium, 130 La. 723, 58 So. 523, 43 L.R.A.,N.S., 211 (La.1912); 40 Tul.L.Rev. 452, 456, n. 27 (1966); 35 Tul.L.Rev. 276, 277–78 (1960). Whether it was a sale or loan depends, of course, on the facts.

The facts presented to us on this issue are scant. A copy of the note was introduced and reflects that it was payable to the *order of Meadow Brook National Bank*. We fully realize that the burden of proving usury rests upon the defendant; however, we think the introduction of a note payable to the plaintiff is prima facie evidence that the Bank loaned the money to Bourbon Kings Hotel Corporation. The only countervailing evidence introduced was a copy of a commitment letter, dated March 26, 1964, from plaintiff to American Mortgage Corporation by the terms of which plaintiff agreed to purchase a first mortgage loan on the completed hotel at 95% of par. We do not think the mere introduction of a commitment letter written some two years prior to the date of the note is sufficient, without more, to overcome the prima facie case established by the introduction of the note payable to the order of the plaintiff. This is certainly not the case of Lafayette Royale Apts., Inc. v. Meadow Brook National Bank, *supra*, in which the borrower executed a note payable to the order of bearer[5] in order to obtain construction financing from an interim financier who sold the note to the bank, pursuant to a previously issued commitment letter, when the construction was completed. If the evidence in this case established the same or similar facts as existed in *Lafayette Royale Apts.*, we would have no hesitancy in reaching the same result as that court did. However, from

---

5. Although the opinion does not reflect that the note was payable to the order of bearer, the record in that case does indicate that it was. It is proper for us to take judicial notice of that record. United States v. Marcello, 280 F.Supp. 510, 521, n. 4 (E.D.La.1968); In the Matter of Southern Land Title Corporation, 301 F. Supp. 379 (E.D.La.1968).

the evidence presented in this case, we can only conclude that the bank *refinanced* the interim financing and thus made a loan to the Bourbon Kings Hotel Corporation rather than a purchase of already existing paper. Nor is this case similar to the *Fenwick Sanitarium* case, heavily relied upon by the plaintiff, where all the parties involved and present treated the transaction as a sale rather than a loan.

## 2. *Was the note usurious?*

At the outset we are confronted with the question of whether state or federal law governs this question. The plaintiff, a national bank, is subject to the provisions of the National Banking Act, 12 U.S.C. § 21 et seq. Section 85 of Title 12 of the United States Code establishes the rates of interest which national banks may charge. It provides in pertinent part:

> "Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District *Where the bank is located,* or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district *where the bank is located,* whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district *where the bank is located,* whichever may be the greater, and such interest may be taken in advance,

> reckoning the days for which the note, bill, or other evidence of debt has to run."

The plaintiff bank is located in the State of New York. Thus, if § 85 is applicable to this case, we must refer to New York law to determine the maximum interest rate. The loan, however, was made in Louisiana. The issue is whether 12 U.S.C. § 85 is applicable in determining the amount of interest a national bank located in New York may charge on a loan made in Louisiana. Surprisingly, this very important issue is apparently novel.

The Supreme Court has stated that the National Banking Act constitutes "by itself a complete system for the establishment and government of national banks." Cook County National Bank v. United States, 107 U.S. 445, 448, 2 S.Ct. 561, 564, 27 L.Ed. 537 (1882). Nevertheless, it is clear that national banks are not totally above the state laws. In Anderson National Bank v. Luckett, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944), the Supreme Court said:

> "This Court has often pointed out that national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." At 248, 64 S.Ct. at 607.

McClellan v. Chipman, 164 U.S. 347, 17 S.Ct. 85, 41 L.Ed. 461 (1896), capsulates these principles as follows:

> "Two propositions have been long since settled by the decisions of this court:

> "First. National banks are 'subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties

to the government that it becomes unconstitutional.' National Bank v. Commonwealth, 9 Wall. [353] 362 [19 L.Ed. 701].

"Second. 'National banks are instrumentalities of the Federal government created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a State to define their duties, or control the conduct of their affairs, is absolutely void, whenever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation, or impairs the efficiencies of these agencies of the Federal government to discharge the duties for the performance of which they were created.' Davis v. Elmira Savings Bank, 161 U.S. 275, 283 [16 S.Ct. 502, 40 L.Ed. 700].

"These two propositions, which are distinct, yet harmonious, practically contain a rule and an exception, the rule being the operation of general state laws upon the dealings and contracts of national banks, the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge the duties imposed upon them by the law of the United States." At 356–357, 17 S.Ct. at 87.

These principles have been reiterated by the Supreme Court in numerous decisions. Lewis v. Fidelity & Deposit Co., 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425 (1934); First National Bank in St. Louis v. Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924); First National Bank of San Jose v. California, 262 U.S. 366, 43 S.Ct. 602, 67 L.Ed. 1030 (1923); Waite v. Dowley, 94 U.S. 527, 24 L.Ed. 181 (1876); National Bank v. Commonwealth, 76 U.S. (9 Wall.) 353, 19 L.Ed. 701 (1869). Applying these principles, the Supreme Court has repeatedly held that when a national bank is found to have violated 12 U.S.C. § 85 by charging a usurious rate of interest, the exclusive remedies for the violation are found in the provisions of 12 U.S.C. § 86 and that the state laws regarding forfeitures, penalties and remedies are inapplicable. McCollum v. Hamilton National Bank, 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938); Schuyler National Bank v. Gadsden, 191 U.S. 451, 24 S.Ct. 129, 48 L.Ed. 258 (1903); Haseltine v. Central Bank of Springfield, 183 U.S. 130, 22 S.Ct. 49, 46 L.Ed. 118 (1901); Stephens v. Monongahela Bank, 111 U.S. 197, 4 S.Ct. 336, 28 L.Ed. 399 (1884); Driesbach v. National Bank, 104 U.S. 52, 26 L.Ed. 658 (1881); Barnet v. National Bank, 98 U.S. 555, 25 L.Ed. 212 (1878); Farmers' & Mechanics' National Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196 (1875). See cases collected in Annot., 101 A.L.R. 750 (1936).

Under these principles if 12 U.S.C. § 85 is applicable, it leaves no room for the operation of the laws of this state as to the interest rate. 12 U.S.C. § 85 would fix the rate of interest the bank may charge (by reference to New York law) and the laws of this state as to the interest rate would then be in conflict with the act of Congress, and therefore would have no force. Thus, in our opinion, it is not proper to determine whether the note in question satisfies *both* the National Banking Act and the Louisiana laws relating to usury, for if Congress has fixed an applicable rate of interest, the state law defers to that legislation which is paramount. There is simply no room for the operation of both state and federal law in the same sphere. The federal law governs and is exclusive. The question, though, is whether 12 U.S.C. § 85 is applicable to this case. We hold that it is not applicable and that Louisiana law governs.

In effect, 12 U.S.C. § 85 provides that a national bank may charge interest at the rate allowed by the laws of the state where the bank is located. The question is whether this was meant to fix the rate of interest on *all* loans made by the bank or merely those loans

made in that state. Admittedly, the above quoted language would seem to include all loans made by the bank and not solely those made in the state where the bank is located. However, in interpreting an act of Congress, we must attempt to implement the congressional purpose in enacting the statute. In fact, in interpreting § 85 the courts have strenuously endeavored to effectuate its purpose despite the fact that the language of that section may not clearly and readily yield the result intended by Congress. See, for example, Hiatt v. San Francisco National Bank, 361 F.2d 504 (9th Cir. 1966), which is such a case and which relies on the purpose of the statute to reach a result not obviously supported by the language of the section. The purpose of § 85 was to place the national banks on an equal footing with the state banks so they would not be limited by congressional restrictions in competing with state banks. Daggs v. Phoenix National Bank, 177 U.S. 549, 20 S.Ct. 732, 44 L.Ed. 882 (1900); Tiffany v. National Bank of Missouri, 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873). The purpose of § 85 is thus subserved *only* by limiting the effect of the section to loans made in the state where the bank is located. Otherwise, a national bank located in a state with a very stringent interest rate would be placed at a severe disadvantage when it made loans outside of the state. In such a situation the purpose of the statute—to put national banks on an equal par with the state banks against which they compete—is frustrated if the national banks are restricted to the interest rate in the states where they are located. On the other hand, we do not think Congress intended this provision to serve as a haven for national banks which, located in states with little or no restrictions as to the interest rate, charge interest on loans made in other states in excess of that allowed by the laws of those states. This, too, would frustrate the congressional purpose of equality between national and state banks regarding the interest rate.

It might be suggested that had Congress intended this result, it could have readily been more explicit. The statute, however, was passed in 1864, over one hundred years ago, and we cannot believe that Congress foresaw, at that time, the financial fluidity which exists today. At that time it was undoubtedly most unusual for a national bank to make a loan in a state other than the state where it was located. Even today, while it is not unusual, banks are hesitant to do so. The above suggestion, then, is not well taken in light of the clear congressional purpose.

Our conclusion is not without support in the language of the statute itself. The sentence following the portion quoted above reads:

"The maximum amount of interest or discount to be charged *at* a branch of an association located outside of the States of the United States and the District of Columbia shall be at the rate allowed by the laws of the country, territory, dependency, province, dominion, insular possession, or other political subdivision where the branch is located."

This sentence does not fix the rate to be charged *by* a branch office. It, in effect, fixes the rate to be charged *at* the branch office which is naturally only the place where the branch is located. This sentence, then, is susceptible of an interpretation on a reasonable basis which limits the rate fixed therein to loans made within the country, territory, etc., where the branch is located. This interpretation, which indicates the congressional intent, is applicable to the provisions of that same section which we are considering, for the meaning of a statute is to be gained from all of its provisions. Ordinarily, we would not dwell on such technical reasoning. However, out of respect for the apparent novelty of this issue and far flung consequences of our decision, we do so only to illustrate that our decision is supported by statutory interpretation founded on a reasonable basis in addition to

the clear guidelines offered by the purpose of the statute.

We hold that 12 U.S.C. § 85 fixes the rate of interest chargeable by a national bank only as to loans made in the state where the bank is located; it does not fix the rate of interest which may be charged by a national bank which is located in one state and makes a loan in another state.

Having determined that 12 U.S.C. § 85 does not fix the rate of interest governing this case, we must determine what law does govern. We think Louisiana law must govern. This much, we believe, is demanded by the National Banking Act. That Act fixes the maximum rate of interest to be charged by national banks on loans made in the state where they are located by reference to the law of that state, the purpose being to establish equality with state banks as to the interest rates. Consequently, loans made in states other than the one where the bank is located ought to be governed by the laws of the state where the loan is made. This establishes equality with state banks in those states as to the interest rates. This result fulfills the legitimate expectations of the parties. We turn then to Louisiana law.

Louisiana law declares interest to be either legal or conventional. Legal interest is fixed at five per cent. La.C.C. Art. 2924. The maximum rate of conventional interest, which is contractual interest, is fixed at eight per cent. La. C.C. Art. 2924. Two exceptions exists to the maximum rate of conventional interest. The first is commercial discounting. This exception was first enacted in 1856 by Act No. 161 which read as follows:

"Section 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana in General Assembly convened,* That the owner or discounter of any note or bond or obligation or other written evidence of debt for the payment of money, payable to order or bearer or by assignment, shall have the right to claim and recover the full amount of such note,

bond or obligation or other written evidence of debt, and all interest not beyond eight per cent. per annum that may accrue thereon, notwithstanding that the rate of interest or discount at which the same may be or may have been discounted has been beyond the rate of eight per cent. per annum interest or discount, any law to the contrary notwithstanding. Provided the terms of this section shall not effect the validity or obligation of any contract entered into before the going into operation of this Act."

This provision is now embodied in Article 2924 of the Louisiana Civil Code in practically identical language. Admittedly, this provision is not couched in the clearest of terms. Judicial interpretation, however, has made clear that it excepts commercial discounting from the maximum rate of conventional interest authorized by law. Crane v. Beatty, 15 La.Ann. 329 (La.1860); Chadwick v. Menard, 104 La. 38, 28 So. 933 (La.1900). As stated by the Louisiana Supreme Court in Mayfield v. Nunn, 239 La. 1021, 121 So.2d 65 (La. 1960):

"[I]ts purpose has been repeatedly stated as intended to facilitate the sale of notes to raise money and nothing more * * *." At 69–70.

As indicated above, commercial discounting—the sale of already existing paper—is a justifiable exception to the laws of usury.

The second exception is loan discounting. This exception was first enacted in 1860 by Act. No. 62 which read as follows:

"Section 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That the owner of any promissory note, bond or written obligation for the payment of money, to order or bearer or transferable by assignment, shall have the right to collect the whole amount of such promissory notes, bonds or written obligations, notwithstanding such prom-

issory notes, bonds or written obligations may include a greater rate of interest or discount than eight per cent. per annum: *Provided,* Such obligations shall not bear more than eight per cent. interest per annum after their maturities until paid."

This provision is also embodied in Article 2924 of the Louisiana Civil Code in practically identical language. It has been consistently interpreted as authorizing the capitalization of interest ("discount") in a note. Mayfield v. Nunn, 239 La. 1021, 121 So.2d 65 (La.1960); Williams' Heirs v. Douglass, 47 La.Ann. 1277, 17 So. 805 (La.1895); General Securities v. Jumonville, 216 La. 681, 44 So.2d 702 (La.1950); Chadwick v. Menard, 104 La. 38, 28 So. 933 (La. 1900); Clasen v. Excel Finance Causeway, Inc., 170 So.2d 924 (La.App.1965), writ ref. 247 La. 619, 172 So.2d 702; Time Finance Co. v. Louis, 152 So.2d 248 (La.App.1963), writ ref. 244 La. 898, 154 So.2d 768; Soab v. Murphy, 174 So.2d 157 (La.App.1965); Williams v. Alphonse Mortgage Co., 144 So.2d 600 (La. App.1962); Jefferson Securities Co. v. Benoit, 92 So.2d 487 (La.App.1957). It effectively eliminates any limitation to the amount of interest which a lender may charge as long as the interest is capitalized. Thus, a lender may legally charge 1000% interest. For example, a lender may loan $100 and exact a $1000 note payable in one year. Although the interest on such a note would be 1000%, the usury laws of Louisiana would not be applicable! [6]

This situation is shocking and is a disgrace to the laws of the State of Louisiana. It is utterly indefensible. It makes a mockery of the Louisiana laws on usury which are applicable only to the careless and sloppy lender. We can fathom no legitimate reason for the legislature's failure to abrogate this horror. No excuse whatsoever exists for the retention of this provision as much as one day longer.

We are not alone in our criticism of this totally unconscionable law. Other courts have invoked the legislature to remedy this deplorable situation. *E. g.,* Clasen v. Excel Finance Causeway, Inc., 170 So.2d 924 (La.App.1965), writ ref. 247 La. 619, 172 So.2d 702; Williams v. Alphonse Mortgage Co., 144 So.2d 600 (La.App.1962). The law review commentators, without exception, have been consistently adamant in demanding legislative reform. *E. g.,* Cazalas, "Usury Law in Louisiana," 14 Loy.L.Rev. 301 (1968); Comment, "Louisiana Loan Law: The Need for Revision," 39 Tul. L.Rev. 328 (1965); 35 Tul.L.Rev. 276 (1960). Yet the legislature still refuses to erase this abhorrent law from the books. And it is our unpleasant duty to apply this law, however pungent.

■■■ The Louisiana law does have one redeeming feature, a truly small concession, in the form of a proviso. Loan discounting is exempt from the law of usury *provided* the note does not bear more than eight per cent interest *after maturity.* The note in question here contained a five per cent discount with interest at the rate of eight per cent *from the date of the note.* The note, failing to satisfy the requirements of the proviso, clearly does not fall within the loan discounting exception of Article 2924. This case, then, appears to be one involving a careless lender inasmuch as the note, which is not excepted from the usury provisions, is clearly usurious.[7]

6. Compare Roux v. Witzman, 125 La. 300, 51 So. 205 (La.1910), in which the lender loaned $25.00 in return for a promissory note in the amount of $47.50 *payable in one month.* While this constituted 90% interest for one month, the effective annual rate of interest was 1,080 per cent.

7. If 12 U.S.C. § 85 were applicable to this case, the note would not be usurious even as to the individual endorsers. That section adopts as the maximum rate of interest the law of the state where the national bank is located. In this case that would be New York. The maximum rate of interest which generally may be charged in that state is 6%. N.Y. General Obligations Law, McKinney's Consol. Laws, c. 24–A, § 5–501. State banks in New York are subject to the same

We pause at this juncture to note that even if the note were not usurious, the plaintiff would be unable to collect the full amount it claims is due on the note. When the holder of a note which contains capitalized interest accelerates the maturity of the entire note, the unearned portion of the discount must be rebated. This rule was established by the Louisiana Supreme Court long ago in Williams' Heirs v. Douglass, 47 La.Ann. 1277, 17 So. 805 (La.1895), in an apparent attempt to ameliorate the harshness of the loan discounting exception to Article 2924 of the Louisiana Civil Code. This rule is firmly embedded in the jurisprudence of Louisiana. Walter E. Heller & Co. v. Mall, Inc., 267 F.Supp. 343 (E.D.La.1967); Unity Plan Finance Co. v. Green, 179 La. 1070, 155 So. 900 (La.1934); Consolidated Loans, Inc. v. Smith, 190 So.2d 522 (La.App.1966), writ ref. 249 La. 753, 190 So.2d 913. Paradoxically, as reflected by the above cases and Williams v. Alphonse Mort. Co., 144 So.2d 600 (La.App.1962), when the *maker* of the note elects to prepay the note, the unearned portion of the discount is *not* remitted. Thus, anyone wishing to prepay a note containing discounted interest will merely default on the note causing the holder to accelerate the maturity and thereby obtain the rebate of unearned discount, provided, of course, that the unearned discount exceeds the amount of attorneys' fees provided for by the note in the event it is placed in the hands of an attorney for collection.[8] This strange anomaly is but another indication that

limitation. N.Y. Banking Law, McKinney's Consol.Laws, c. 2, § 108. However, for many years in New York corporations have been barred by statute from asserting the defense of usury. N.Y. General Obligations Law § 5-521. The defendants argued that the federal banking statute adopts the state law *only* as to the maximum rate of interest and does not incorporate statutes barring corporations from asserting the defense of usury. Such statutes, argued the defendants, are merely procedural. We cannot agree with this contention. As indicated above, the purpose of § 85 was to place the national banks on an equal footing with the state banks. It would truly frustrate this purpose to refer only to the maximum rate of interest without also incorporating the exceptions thereto. To adopt the defendants' argument would result in rank discrimination against national banks, thus defeating the clear congressional intent. This we could not do. Moreover, we have found but three decisions on this issue, and all three decisions hold that the state statute barring corporations from asserting the defense of usury is applicable in determining whether the national bank violated 12 U.S.C. § 85 in making a loan to a corporation. McNellis v. Merchants National Bank & Trust Co. of Syracuse, 390 F.2d 239 (2d Cir. 1968); In re Wild, Fed.Cas. No. 17,645, 11 Blatchf. 243 (N.Y. Cir. 1873); Moers v. American Exch. National Bank, 208 App.Div. 473, 203 N. Y.S. 727 (Sup.Ct., App.Div., 1st Dept. 1924). (Coincidentally, all three decisions involved the New York statute in question here.) If 12 U.S.C. § 85 were applicable, we would reject the defendants' argument in light of the clear congressional purpose and the force of precedent. Moreover, we would be unable to hold that no rate of interest was fixed by the laws of the state in this situation and that therefore the interest rate on the note in question is limited to 7% in accordance with the second sentence of 12 U.S.C. § 85. This much is clear by the decision in Hiatt v. San Francisco National Bank, 361 F.2d 504 (9th Cir. 1966), which rejected an even more cogent argument, and which held that national banks may charge as much interest as may be legally charged by the state's banks under the state's existing law.

Finally, inasmuch as this is a suit against the individual endorsers of the note, the remaining question would be whether 12 U.S.C. § 85 would include the New York law barring individual endorsers on a corporate note from asserting the defense of usury by virtue of the state statute barring corporations from asserting that defense. (See New York cases cited *infra* in text.) Bearing in mind the congressional purpose underlying § 85, we think it would incorporate the law of New York in that respect. This would bring to fruition absolute equality between state and national banks in New York regarding the issue of whether usury is an available defense.

8. Even the cautionary proviso can be ignored if it is certain that the holder himself will accelerate the maturity without resort to an attorney.

the Louisiana laws on usury are in desperate and immediate need of legislative revision.

In this case the holder accelerated the maturity of the note, thereby necessitating a remission of the unearned discount. The unearned discount is determined by dividing the amount of the discount by the number of monthly payments, multiplying that figure by the number of months which ran on the note prior to the acceleration, and subtracting this figure from the amount of the discount. Dividing 180 into $210,000, the amount of the discount, yields $1,166.666, which is the amount of discount earned each month. Multiplying that figure by six, the number of months for which payments were made prior to acceleration, yields $7,000, which is the amount of the earned discount. That figure subtracted from $210,000 is $203,000, which is the amount of the unearned discount which would have to be remitted if the note in question were not usurious.

3. *Does L.S.A. 12:603 bar endorsers on corporate note from raising defense of usury?*

Plaintiff contends that the defendant endorsers who are liable *in solido* with the corporate maker on the note in question are barred from raising the defense of usury by virtue of L.R.S. 12:603 which provides:

"Notwithstanding any other provision of the laws of this state to the contrary, any domestic or foreign corporation organized for profit may agree to pay any rate of interest in excess of the maximum rate of conventional interest authorized by law, and as to any such agreement, the claim or defense of usury, or of the taking of interest in excess of the maximum rate of conventional interest, by such corporation, is prohibited."

This statute was enacted in 1965 and has not yet been subjected to the crucible of judicial interpretation by the Louisiana state courts. The issue then, a highly important one, is *res nova* in Louisiana.

The plaintiff relies upon decisions from several other jurisdictions. Those decisions establish the principle that, when a corporation is barred from asserting the defense of usury by a statute similar to the one above, the individual endorsers, guarantors, or sureties of a corporate note or obligation may not raise the defense of usury.[9] Winkle v. Scott, 99 F.2d 299 (8th Cir. 1938); Tennant v. Joerns, 329 Ill. 34, 160 N.E. 160 (Ill.1928); Penrose v. Canton Nat'l Bank, 147 Md. 200, 127 A. 852 (Md.Ct. of Appeals 1925); Pardee v. Fetter, 345 Mich. 548, 77 N.W.2d 124 (Mich.1956); Dahmes v. Industrial Credit Co., 261 Minn. 26, 110 N.W.2d 484 (Minn.1961); Gelber v. Kugel's Tavern, 10 N.J. 191, 89 A.2d 654 (N.J.1952); Ferdon v. Zarriello Bros. Inc., 87 N.J.Super. 124, 208 A.2d 186 (N.J.Super.Ct.1965); Fine v. H. Klein, Inc., 10 N.J.Super. 295, 77 A.

---

9. However, when an individual is a co-maker on a note along with a corporate maker, he may plead the defense of usury because he has then been "usurized." Grove v. Chicago Title & Tr. Co., 25 Ill. App.2d 402, 166 N.E.2d 630 (Ill.App. 1960); Roeder v. Judovitz, 30 App.Div. 2d 770, 292 N.Y.S.2d 267 (Sup.Ct., App. Div. 4th Dept. 1968); Rosen v. Columbia Sav. & Loan Ass'n, 29 Misc.2d 329, 213 N.Y.S.2d 765, (Supreme Court, Nassau County, 1961), aff'd, 15 A.D.2d 810, 225 N.Y.S.2d 495 (1962); Metz v. Taglieri, 29 Misc.2d 841, 215 N.Y.S.2d 263 (Supreme Court, Suffolk County, 1961); Astra Pictures, Inc. v. Shapiro, 182 Misc. 19, 48 N.Y.S.2d 858 (Supreme Court, Appellate Term, First Dept. 1944);

Pink v. Kaplan, 252 App.Div. 490, 300 N.Y.S. 45 (Supreme Court, App.Div.2d Dept. 1937); Cabrera v. Olsen, 165 Misc. 374, 300 N.Y.S. 524 (Supreme Court, New York County, 1937); Rockmore v. Epstein, 127 Misc. 526, 217 N.Y.S. 76 (Supreme Court, Kings County, 1926); Amity Finance Corp. v. Crock, 15 Ohio L.Abs. 243 (Ohio Appeals, 2d Dist.1933). Rockmore v. Epstein, *supra*, clearly holds that the individual comaker cannot even assert the defense in this situation unless it is shown that the money was actually loaned to the individual as well as the corporation for if the money were loaned solely to the corporation, then, according to *Rockmore*, the individual has not been victimized.

2d 295 (N.J.County Ct. 1950); General Phoenix Corp. v. Cabot, 300 N.Y. 87, 89 N.E.2d 238 (N.Y.1949); Waterman v. Witteman, 25 App.Div.2d 531, 267 N.Y.S. 2d 660 (Supreme Court, App.Div., 2d Dept. 1966); Pink v. Kaplan, 252 App. Div. 490, 300 N.Y.S. 45 (Supreme Court, App.Div., 2d Dept., 1937); Rosen v. Columbia Sav. & Loan Ass'n, 29 Misc.2d 329, 213 N.Y.S.2d 765 (Supreme Court, Nassau County, 1961), aff'd, 15 A.D.2d 810, 225 N.Y.S.2d 495 (1962); Metz v. Taglieri, 29 Misc.2d 841, 215 N.Y.S.2d 263 (Supreme Court, Suffolk County 1961); Margulis v. Messinger, 34 Misc. 2d 699, 210 N.Y.S.2d 855 (Supreme Court, Kings County, 1960); Elias v. Schwartz, 22 Misc.2d 129, 201 N.Y.S.2d 223 (Supreme Court, Nassau County, 1960); Ollendorf v. Lissberger, 176 Misc. 661, 28 N.Y.S.2d 455 (Supreme Court, New York County, 1941); Cabrera v. Olsen, 165 Misc. 374, 300 N.Y.S. 524 (Supreme Court, New York County, 1937); Yorktown Management Co. v. Record Realty Co., 236 N.Y.S.2d 866, 867 (New York City Civil Court, 1962); Raby v. Commercial Banking Corp., 208 Pa.Super. 52, 220 A.2d 659 (Pa.App. 1966). A rationale advanced in support of the rule is that such a person has not been, to adapt an apt expression, "usurized" since he did not borrow the money. The corporation is the borrower and the individual surety has merely guaranteed the payment of the corporate obligation; therefore, it is assumed that he was not the unwitting nor the defenseless victim of financial duress. Hence, the policy supporting the usury laws is not violated if the individual endorser, who is not a victimized borrower, is forced to pay the full amount of the usurious corporate note. We question the validity of this rationale. We think that the policy supporting the usury laws is equally applicable in the case of an individual endorser on a corporate note as in the case of an individual maker. The above justification for denying the defense of usury to individual endorsers on a corporate note assumes that the usury laws exist to pro-

tect only the unsophisticated or defenseless borrower. We do not agree. The usury laws apply to all individuals, regardless of their sophistication or circumstances. Certainly, then, the basic legal policy underlying the usury laws is to prevent the *personal financial ruin* of individuals through excessive rates of interest. This policy is equally frustrated when an individual is called upon to pay his own usurious loan as when he is called upon to pay the usurious loan of a corporation. Cf., Lesser v. Strubbe, 39 N.J. 90, 187 A.2d 705 (N.J.1963) (Dissenting opinion). Moreover, we do not think the rule furthers the legal policy underlying the disallowance of usury as a defense to corporations. The basic justifications for disallowing the defense of usury to corporations are three. Corporations are thought to have greater bargaining power than individuals. Corporate owners are protected by their limited liability. Finally, it promotes commerce; a corporation borrows to engage in a profitable business venture rather than to avoid financial ruin, and in a capitalistic society it should be free to pay whatever is necessary to attract the necessary capital. *E. g.,* "Usury and Conflicts," 50 Cal.L.Rev. 123, 208–209 (1967). As far as these generalizations are true, we posit no quarrel with the legislative policy exempting corporate borrowers from the protection of the usury laws. Essentially, the defense of usury is barred to corporations because the danger of personal financial ruin is nonexistent. Yet a very real danger of personal financial ruin does exist as to the individual endorsers of the corporate obligation. To permit such endorsers to plead usury as a defense does no violence to the legal policy prohibiting corporations from asserting the defense, and to deny the defense to individual endorsers truly frustrates the legal policy supporting the usury laws. Consequently, we would not extend the statute barring corporations from raising the defense of usury beyond that which its policy justifies at the expense of the policy

underlying the usury laws, unless, of course, we were compelled to do so by the force of precedent.

The great number of New York decisions establishing the so-called New York rule and the handful of decisions from other states adopting that rule is, of course, highly persuasive authority for the plaintiff's position. No decision to the contrary has been cited to us nor have we found one through our own research. As we have already indicated, however, we entertain grave doubts as to the wisdom of that rule. Our task, though, is not to blindly follow the New York decisions, nor even to fashion what we consider to be the better rule. *Erie* bound, we must endeavor to do as a Louisiana court would do if faced with this question novel to Louisiana. The question is actually one of legislative intent. The defendants direct their argument precisely to this point.

■ The defendants urge us to consider an amendment to the bill before it was enacted into law as evidencing the legislative intent. As originally presented to the Senate, Section 1 of Senate Bill 33 read as follows:

### "AN ACT
"To amend Title 12 of the Louisiana Revised Statutes of 1950 to add thereto a new Section, to be designated as Section 603 of Title 12, relative to interest rates chargeable to corporations, those persons bound in solido with such corporations, or its successors, guarantors, sureties, assigns, and anyone acting on its behalf.

"Be it enacted by the Legislature of Louisiana:

"Section 1. Section 603 of Title 12 of the Louisiana Revised Statutes of 1950 is hereby enacted to read as follows:

"§ 603. Rate of interest paid by corporations

"Notwithstanding any other provision of the laws of this state to the contrary, any domestic or foreign corporation organized for profit may agree to pay any rate of interest in excess of the maximum rate of conventional interest authorized

by law, and as to any such agreement, the claim or defense of usury, or of the taking of interest in excess of the maximum rate of conventional interest, by such corporation [*those persons bound in solido with such corporation, or its successors, guarantors, sureties, assigns, and anyone on its behalf*] is prohibited." The italicized portion of this bill in brackets was later deleted by an amendment. The deleted portion would have clearly barred individual endorsers liable *in solido* with the corporate maker of a note from asserting the defense of usury. By deliberately deleting that portion of the bill, the legislature made clear its intent, the defendants argue, that it did not wish to bar individuals from asserting the defense of usury even on a corporate note. The plaintiff argues that the provision was deleted because the legislature was aware of the decisions cited above, and therefore it was merely deleting that which was unnecessary. We find the logic of the defendants' argument compelling. Prior to the enactment of this statute, no party to a note, whether it was an individual or a corporation, was barred by Louisiana law from asserting the defense of usury regardless of whether it was a corporate or an individual note. The Louisiana legislature has now declared that a corporate maker of a note may not assert the defense of usury. The question is whether it intended to abrogate the former law in any respect other than this. We do not think it did; otherwise, why would it have *deliberately* deleted the clause which would have clearly established its intention? The clause was in the bill as originally drafted. The legislature *deliberately* struck it from the bill. The only logical conclusion we can draw is that the Louisiana legislature did not intend to modify the existing law in any other respect and did not intend to preclude individual endorsers of corporate notes from raising the defense of usury. The plaintiff's argument would carry more weight if the provision had never been incorporated into the bill, but because it was included and was deliberately deleted, we conclude that the legis-

lature did not intend to bar individual endorsers of a corporate note from raising the defense of usury.

Moreover, our ultimate conclusion is further compelled by Article 2098 of the Louisiana Civil Code which provides:

"A codebtor *in solido,* being sued by the creditor, may plead all the exceptions resulting from the *nature of the obligation,* and all such as are personal to himself, as well as such as are common to all the codebtors."

This article clearly allows the defendants, who are liable *in solido* on the corporate note, to plead usury as a defense. It can hardly be denied that usury goes to the *nature of the obligation.* La.Stat.Ann. 12:603 does not say that a note made by a corporation with interest at a rate in excess of the maximum rate of conventional interest authorized by law is not usurious. It merely says that a corporation may agree to pay in excess of that rate and that such a corporation may not assert the defense of usury. While we have found no decisions under Article 2098 regarding usury, usury is surely a defense resulting from the *nature of the obligation.* Under Article 3060 of the Louisiana Civil Code, a surety may plead all exceptions which are *"inherent to the debt."* Huntington v. Westerfield, 2 Or.App. 405 (1905), held that usury was "inherent to the debt." *A fortiori* usury goes to the nature of the obligation. Thus, even if we were unable to ascertain the legislative intent of La.Stat.Ann. 12:603, we would be unable to follow the decisions from other jurisdictions relied upon by the plaintiff because of Article 2098 which is binding upon us.

We are not unaware of the statement in Meadow Brook National Bank v. Massengill, 285 F.Supp. 55 (E.D.La.1968), that individual endorsers who are bound *in solido* on a promissory note with the corporate maker are precluded from asserting the defense of usury by virtue of the provisions of La.Stat.Ann. 12:603. That statement, however, was purely

dictum inasmuch as the court concluded that the note in question was not usurious. Moreover, no Louisiana decisions were cited as authority for that statement. It was supported only by some of the decisions from other jurisdictions cited above. Further, we have no indication that the legislative history of La. Stat.Ann. 12:603 was presented to the court for its consideration in that case as it was here. Finally, it does not appear that the court was asked to pass on the meaning of Article 2098 of the Louisiana Civil Code as we have been asked to do. For these reasons we do not feel constrained to adhere to the dictum in the *Massengill* decision.

4. *Effect of usury.*

Having concluded that the note is usurious and that the defendants are not barred from asserting this defense, we must determine the effect of usury. Plaintiff argues that when a note is usurious, the interest should be reduced to the maximum allowed by law—eight per cent. It cites three cases for this principle. Osborne v. Mossler Acceptance Co., 214 La. 503, 38 So.2d 151 (La. 1948); Williams v. Halsmith, 17 La.Ann. 200 (La.1856); Clark v. Harvey, 9 Orl. App. 275, 277 (La.App.1912). The cases cited by the plaintiff clearly support its position. However, from a study of the history of the Louisiana law of usury, we are convinced that those cases do not correctly state the law.

The pertinent history commences in the year 1844 when the Louisiana legislature amended the Civil Code as follows:

"Section 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That article two thousand eight hundred and ninety-five of the Civil Code of Louisiana, [now Article 2924], be amended that the amount of conventional interest shall in no case exceed eight per cent, *under pain of forfeiture of the entire interest so contracted."* Acts of 1844, No. 25.

This was the first legislative enactment, as far as we know, regarding the *effect of usury*. The Louisiana Supreme Court interpreted this statute to mean that the *entire contractual interest* was forfeited and not merely the usurious portion. Merville v. Villeneuve LeBlanc, Jr. & Co., 12 La.Ann. 221 (La.1857); Payne & Harrison v. Waterston, 16 La.Ann. 239 (La.1861).[10] The Act of 1844 was re-enacted in 1855 in practically identical language:

> "Sec. 2. *Be it further enacted, etc.,* That Article two thousand eight hundred and ninety-five of the Civil Code shall be so amended that the amount of conventional interest shall in no case exceed eight per cent. *under pain of forfeiture of the entire interest so contracted.*" Acts of 1855, No. 291.

Thus, the 1855 Act left unchanged the effect of usury under the 1844 Act.

In the following year, Act No. 161 of 1856, quoted *supra,* was enacted. The Louisiana Supreme Court first came to grips with the meaning of the 1856 Act in Crane v. Beatty, 15 La.Ann. 329 (La. 1860). In considering the effect of the 1856 Act on the Act of 1855, the court stated:

> "After mature consideration, the majority of this court came to the conclusion, that the Above Act of the Legislature [Act of 1856] does not affect, in the case at bar, the Act approved March 15th, 1855, p. 352, entitled 'An Act to regulate the rates of interest,' which latter Act must control the decision of the present action. The Act of March 20, 1856, had in view the sale of notes and other written obligations, their discount or sale, for the purpose of raising money, and nothing more.
>
> \*      \*      \*      \*      \*      \*
>
> "The penalty of the Act of 1855 is a forfeiture of the entire interest contracted for." At 329–330.

Thus rejecting the argument that the Act of 1856 abrogated the Act of 1855 as to the effect of usury, the court disallowed the entire interest on the usurious note. The Louisiana Supreme Court adhered to this decision in Campbell & Strong v. Hilliard, 15 La.Ann. 537 (La.1860), and again disallowed the entire interest on usurious notes. *Beatty* was again reaffirmed by the Supreme Court of Louisiana in Weaver v. Maillot, 15 La.Ann. 395 (La.1860). Then in 1865 the Louisiana Supreme Court decided the case of Williams v. Halsmith, 17 La.Ann. 200 (La. 1865), one of the cases relied upon by the plaintiff. Relying solely on the Act of 1856, the *Halsmith* court disallowed only the amount of interest in excess of eight per cent. The court cited no other authority for its decision. It clearly overlooked the *Beatty, Strong* and *Weaver* decisions. Moreover, it did not even mention the Act of 1855. *Halsmith* is clearly a maverick decision. It has been totally ignored by every subsequent decision on the subject; shepardizing *Halsmith* reveals that it has only been cited once and that was merely in a passing remark by the court in Mayfield v. Nunn, 239 La. 1021, 121 So.2d 65 (La.1960). Moreover, subsequent decisions by the Louisiana Supreme Court, ignoring *Halsmith,* reaffirmed *Beatty* and disallowed *all contractual interest* on usurious notes. Tarver v. Winn, 18 La.Ann. 557 (La. 1866); Succession of Rhoton, 34 La.Ann. 893 (La.1882); Martin v. Lake, 37 La. Ann. 763 (La.1885) (dicta). At this point in time it was clear that the effect of a usurious note was the forfeiture of the entire contractual interest.

In the meanwhile, the Civil Code was revised in 1870. The provision regarding the forfeiture of the entire interest was omitted from the Civil Code of 1870. It was, however, included in the 1870 codification of the Revised Statutes as section 1884. In 1908 Article 2924 was reenacted and amended in two respects, *neither one relating to the effect of usury.* The prescriptive period for suits to recover usurious interest was changed

---

10.  Both of these cases were decided under the Act of 1844.

from twelve months to two years; and the following rule of evidence was added:

"Provided however where usury is a defense to a suit on a promissory note or other contract of similar character, that it is permissible for the defendant to show said usury whether same was given by way of discount or otherwise, by any competent evidence." Acts of 1908, No. 68.

The Act of 1908 also contained the usual provision repealing all laws in conflict therewith.

Four years later the Orleans Court of Appeals, believing that the Act of 1855 was in conflict with the Act of 1908, and therefore repealed by the latter Act, held that the proper penalty for charging usurious interest was a reduction of the conventional interest to eight per cent as the maximum allowed by the law. Clark v. Harvey, 9 Orl.App. 275, 277 (La.App. 1912). Taken in historical context, this decision was clearly erroneous. Had there been any inconsistency in the various provisions, the courts would have been unable to give effect to all of them even prior to the Act of 1908. Yet prior to that time the courts had consistently given effect to each of the various provisions. Indeed, it had even been expressly stated that the provision for the forfeiture of the entire interest was entirely consistent with the provisions relating to the maximum rate of interest and the exceptions thereto. E. g., Succession of Rhoton, 34 La.Ann. 893 (La. 1882); John Chaffe & Sons v. Heyner, 31 La.Ann. 594 (La.1879), (dissenting opinion of J. Marr at 606). Moreover, it is typical for the legislature to include such a repealing provision, e. g., Acts of 1860, No. 62, and yet prior to Clark it had never been held that the repealing provision of the various enactments on usury constituted a repeal of the forfeiture provisions. If the Act of 1855 survived the Act of 1856 and the Act of 1860 authorizing commercial discounting and loan discounting respectively, it surely could not be inconsistent with the Act of 1908 which merely altered the prescrip-tive period and established a rule of evidence relating to the proof of usury. Finally, and perhaps most simply illustrating the error of Clark, is the fact that the provision for the forfeiture of the entire interest was carried forward from the Louisiana Revised Statutes of 1870, section 1884, and recodified in the 1950 revision of the Louisiana Revised Statutes. La.Stat.Ann. 9:3501. It reads as follows:

"Any contract for the payment of interest in excess of that authorized by law shall result in the *forfeiture of the entire interest so contracted.*"

The recodification of this statute in the 1950 Revised Statutes unequivocally demonstrates the error of Clark. The Act of 1908 simply did not repeal the Act of 1855.

The only decision citing Clark is the Louisiana Supreme Court decision in Osborne v. Mossler Acceptance Co., 214 La. 503, 38 So.2d 151 (La.1948), which is the final case relied upon by the plaintiff. Relying solely and entirely on the decision in Clark, the Osborne court stated that the effect of usury is to reduce the interest to the maximum conventional interest of eight per cent. An examination of that opinion, however, reveals that the defense of usury was not even presented as an issue to the court. Presumably then, it was never briefed for the court by the attorneys. The court raised the issue *sua sponte* through questioning on oral argument. Moreover, the decision was rendered two years prior to the recodification of the Louisiana Revised Statutes in 1950 which clearly shows the Clark decision to be wrong. Under these circumstances we do not believe the Osborne decision changed the law of Louisiana; it merely compounded the error wrought by Clark. The only decision citing Osborne as authority for the issue in question is Vosbein v. Leopold, 230 La. 21, 87 So.2d 715 (La.1956). Although Vosbein was decided subsequent to the recodification of the Louisiana Revised Statutes in 1950, it did not even mention La.Stat.Ann. 9:3501;

instead it relied solely on the *Osborne* decision. Thus, *Vosbein,* like *Osborne,* is merely a perpetuation of the original error of *Clark.* We do not believe the Supreme Court of Louisiana could adhere to the *Clark* decision at this time if it were given the opportunity to pass on the clear meaning of La.Stat.Ann. 9:3501 in light of that section's long history.

We think the error of *Clark* is further demonstrated by the fact that all of the decisions of the Louisiana courts, other than *Osborne* and *Vosbein,* subsequent to *Clark* hold that the effect of usury is the forfeiture of the entire contractual interest. Green v. Johnson, 14 La.App. 110, 129 So. 384 (La.App.1930); W. W. Page & Son v. Russell, 7 La.App. 129, (La.App.1927); Sherer-Gillett Co. v. Bennett, 5 Pelt.Orl.App. 649 (La.App. 1922). Moreover, the decisions which have considered La.Stat.Ann. 9:3501 since its recodification in 1950 have adhered to the position that it requires the forfeiture of the entire contractual interest on usurious obligations. Lawrence v. Durr, 195 So.2d 337 (La.App. 1967); Clasen v. Excel Finance Causeway, Inc., 170 So.2d 924 (La.App.1965), writ ref. 247 La. 619, 172 So.2d 702; Berger v. DeSalvo, 156 So.2d 323 (La. App.1963), writ ref. 245 La. 86, 157 So. 2d 231. Finally, in this connection, we think it is clear that if the Louisiana Supreme Court were to interpret La.Stat. Ann. 9:3501, it would have no alternative but to hold that it requires the forfeiture of the entire contractual interest. In its most recent decision touching in this area, the Louisiana Supreme Court recognized that the Act of 1855 required the forfeiture of the entire interest on a usurious contract. Mayfield v. Nunn, 239 La. 1021, 121 So.2d 65, 69, n. 5 (La.

1960). The language of La.Stat.Ann. 9:3501 is identical to that in the Act of 1855 in that it requires the "forfeiture of the entire interest so contracted." Thus, this most recent expression of the Louisiana Supreme Court on the meaning of the Act of 1855, which expression is consistent with all of the decisions interpreting that Act [11] is equally applicable to the meaning of La.Stat.Ann. 9:3501 since the language of the two provisions are identical.

We are certain, then, that under La.Stat.Ann. 9:3501, the effect of usury is the forfeiture of the entire contractual interest. We have delved into this matter at some length solely to prevent the perpetuation of the *Clark* error and its progeny.[12]

The correct rule in Louisiana is that usury demands the forfeiture of the entire contractual interest; only the principal amount of a usurious note may be recovered.[13] This does not mean that the plaintiff may recover the capitalized interest included in the face amount of the note. *All* of the interest is forfeited. Discount is interest. It is merely excepted from the usury provisions under certain conditions. Those conditions not having been met, the discount, too, must be forfeited. Article 2924, in effect, provides that the face amount of a usurious note may be collected *only* when it does not bear more than eight per cent interest *after maturity.* Consequently, when, as here, the discounted note bears eight per cent interest *from date,* the payee may *not* recover the face amount of the note. The payee may recover only the principal sum actually advanced to the borrower. No inconsistency exists between Article 2924 and La.Stat.Ann. 9:3501 in this respect. Section 3501

11. *Halsmith* did not even mention the Act of 1855.

12. See Pellerin Laundry Machinery Sales Co. v. Hoque, 219 F.Supp. 629 (W.D. Ark.1963), where the court, going no further than *Osborne* and *Vosbein,* concluded that the law of Louisiana demanded only the forfeiture of the interest ex-

ceeding eight per cent on a usurious obligation.

13. We, of course, are not concerned with the effect of usury on a holder in due course and accordingly intimate no view on the validity of the defense of usury in such a situation.

requires the forfeiture of *all* interest. This includes discount, the forfeiture of which is clearly contemplated by Article 2924 when the conditions of the proviso excepting loan discounting are not fulfilled.

Having determined that the plaintiff cannot recover any of the interest for which it contracted due to the usury, we must still decide the proper time from which to award legal interest at the rate of five per cent. The fact that the plaintiff is entitled to legal interest is hardly open to question, but in the absence of legislation we think it would pose an interesting problem as to the date from which such interest is to accrue, that is, from the date of maturity or from the date of judicial demand. The legislature, however, has anticipated the problem, and Article 1938 of the Louisiana Civil Code precludes further speculation on this point. It provides:

> "All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated."

The portion of the note regarding interest being null and void due to usury, it is as if the parties had not contracted at all regarding interest, and we must apply Article 1938 awarding interest from the date of maturity of the note. See also, Tarver v. Winn, 18 La.Ann. 557 (La. 1866); Green v. Johnson, 14 La.App. 110, 129 So. 384 (La.App.1930); W. W. Page & Son v. Russell, 7 La.App. 129 (La.App.1927). When, then, did the note mature? We hold that the entire note became due and payable on March 1, 1967, and accordingly award legal interest at the rate of five per cent from that date on the unpaid principal balance.

The note provides for 180 equal monthly installments in the amount of $35,154. This includes interest payments as well as payments on the face amount of the note. The bank apparently used the so-called rule of 78ths in calculating which portion of each monthly payment would be allocated to interest and then to principal. This results in a greater portion of the payment being allocated to interest at first with the allocations to principal gradually and constantly increasing until at the end of the payments it constitutes the major portion of the payment.[14] While this method is acceptable where interest payments are being calculated, Walter E. Heller & Co. v. Mall, Inc., 267 F.Supp. 343 (E.D.La.1967), it is not acceptable for determining the amount of principal due each month when interest is stricken as usurious. As indicated above, when a note is usurious, it is as if the parties had not contracted at all regarding interest. We must therefore disregard all of the provisions of the contract relating to interest including the rule of 78ths used to determine the allocation between principal and interest. It does not, however, affect the provision calling for 180 equal monthly installments. Consequently, we must divide the principal amount of the note by 180 to determine the amount of principal due each month. The principal amount of the note, after striking the discount, was $3,990,000. That sum divided by 180 is $22,166.666. This is the amount of principal which was due each month. In this case, six payments of $35,154 totaling $210,924 were made. While ordinarily payments are first applied to interest, these payments must all be credited to principal inasmuch as the entire contractual interest was forfeited. These payments, therefore, reduced the principal balance of the note to $3,779,076 as of December 1, 1966. As of that date, however, only seven payments totaling $155,162.47 were due. Therefore, the note was not in default as of December 1, 1966. However, as of March 1, 1967, ten payments totaling $221,666.67 should have been made. Thus, on that date the principal balance should have been reduced to $3,768,333.33. Since the prin-

---

14. Of the $219,924 paid on the note in this case, $167,278.21 was allocated to interest and only $43,645.79 was applied to principal under this method.

cipal balance had only been reduced to $3,779,076, the note was in default by some $10,742.67 as of March 1, 1967.

The holder of the note exercised its option under the acceleration clause to mature the entire indebtedness as of December 1, 1966, when according to the plaintiff, the note was in default. This, of course, could not mature the entire indebtedness as of that date since the note was not in default at that time. We think it should be regarded, however, as an exercise of the option at the earliest date possible, that is, as soon as the note was actually in default. Otherwise, the holder would be forced, at his peril, to intone the magic words continuously to insure that the acceleration of the note was effective. The law will not descend to such nonsense at the expense of one who has made clear his intent to exercise his contractual rights. Hence, in view of the fact that the note was in default as of March 1, 1967, we regard that date as the date of maturity for the entire note inasmuch as the plaintiff had previously attempted to accelerate the maturity which was ineffective through no lack of conduct on the plaintiff's part.[15] Consequently, we must award a judgment in favor of the plaintiff against the defendants in the sum of $3,779,076 with interest on that amount at the rate of five per cent from March 1, 1967, together with attorneys' fees of ten per cent as provided in the note. No evidence or arguments were presented as to the date from which attorneys' fees are to be awarded nor as to the sum on which they are to be based. Therefore we leave this to be resolved by the parties and, in the event they are unable to reach an agreement on this matter, we will afford them a hearing as to the attorneys' fees.

Let judgment be entered accordingly.

15. Our treatment of the plaintiff's attempted acceleration as a continuous exercise of its option makes little actual difference in the result in this case since this suit was filed on March 10, 1967, demanding the entire balance on the note. The filing of the suit is surely an exercise of the plaintiff's option to accelerate the maturity of the entire note.