## McCLELLAN *v.* CHIPMAN.

ERROR TO THE SUPERIOR COURT OF THE STATE OF MASSACHUSETTS.

## TRADERS' BANK *v.* CHIPMAN.

ERROR TO THE SUPREME JUDICIAL COURT OF THE STATE OF MASSACHUSETTS.

Nos. 35, 36. ˙Argued April 28, 29, 1896. — Decided November 30, 1896.

The provisions of §§ 96 and 98 of c. 157 of the Public Statutes of Massachusetts, invalidating preferences made by insolvent debtors and assignments or transfers made in contemplation of insolvency, do not conflict with the provisions contained in Rev. Stat. §§ 5136 and 5137, relating to national banks and to mortgages of real estate made to them in good faith by way of security for debts previously contracted, and are valid when applied to claims of such banks against insolvent debtors.

*National Bank* ˙v. *Commonwealth*, 9 Wall. 353, affirmed to the point that it is only when a state law incapacitates a national bank from discharging its duties to the government that it becomes unconstitutional: and *Davis* v. *Elmira Savings Bank*, 161 U. S. 275, affirmed to the point that national banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States: and the two distinct propositions held to be harmonious.

THE Traders' National Bank, a corporation organized under the banking laws of the United States, carried on its business in the city of Boston. The firm of Dudley Hall & Company, composed of Dudley Hall and Dudley C. Hall, were likewise engaged in business in Boston, and were customers of the bank, having a deposit account therein. By an understanding between the bank and the firm, made to induce the latter

to keep its deposit account with the former, the firm was to be considered as entitled to a line of discount on its paper to the extent of $20,000. On the 16th of October, 1890, the partnership then being in the enjoyment of its full agreed line of discount, borrowed from the bank an additional sum of $12,500, which was evidenced by a note of Dudley C. Hall at one month, endorsed by the firm and secured by the pledge of certain shares of the Ætna Mining Company and by two notes of that company, amounting to about $2500. When this note matured, on the 16th of November, 1890, a new demand note in an equal amount was given in renewal thereof and was secured by the same collaterals. On the 17th of December, 1890, payment of this note was demanded, and the debtor being unable to meet it a new note at two months was given, the sum thereof was passed to the credit of the firm, and the old note was debited, cancelled and surrendered. This new note was drawn like the preceding one by Hall and endorsed by the firm, and was secured, not only by the same collaterals, but also by a conveyance of two pieces of land made by Dudley C. Hall to A. D. McClellan, a director of the bank, he giving to Hall a writing, in which it was declared that the conveyance was made for the sole purpose of securing the note held by the bank, and that on its payment the land would be retransferred. In March, 1891, the firm suspended payment, and the members thereof were adjudged to be insolvent under the insolvency laws of the State of Massachusetts, and made to their assignees an assignment of all their property, as required by the statutes of the State. In May the assignees brought a writ of entry against McClellan to recover the two pieces of land.

Sections 96 and 98 of chapter 157 of the Public Statutes of the State of Massachusetts, relied on by the assignees to sustain their action to recover the land, are as follows:

"SEC. 96. If a person, being insolvent or in contemplation of insolvency, within six months before the filing of the petition by or against him, with a view to give a preference to a creditor or person who has a claim against him, or is under any liability for him, procures any part of his property to be

attached, sequestered or seized on execution, or makes any payment, pledge, assignment, transfer or conveyance of any part of his property, either directly or indirectly, absolutely or conditionally, the person receiving such payment, pledge, assignment, transfer or conveyance, or to be benefited thereby, having reasonable cause to believe such person is insolvent or in contemplation of insolvency, and that such payment, pledge, assignment or conveyance is made in fraud of the laws relating to insolvency, the same shall be void ; and the assignees may recover the property or the value of it from the person so receiving it or so to be benefited."

" SEC. 98. If a person, being insolvent or in contemplation of insolvency, within six months before the filing of the petition by or against him, makes a sale, assignment, transfer or other conveyance of any description of any part of his property to a person who then has reasonable cause to believe him to be insolvent or in contemplation of insolvency, and that such sale, assignment, transfer or other conveyance is made with a view to prevent the property from coming to his assignee in insolvency, or to prevent the same from being distributed under the laws relating to insolvency, or to defeat the object of, or in any way to impair, hinder, impede or delay the operation and effect of, or to evade any of said provisions, the sale, assignment, transfer or conveyance thereof shall be void, and the assignee may recover the property or the value thereof as assets of the insolvent. And if such sale, assignment, transfer or conveyance is not made in the usual and ordinary course of business of the debtor, that fact shall be *prima facie* evidence of such cause of belief."

The action was tried before a jury and there was a verdict in favor of the surviving assignee, and exceptions were filed and allowed. Whilst these exceptions were pending before the Supreme Judicial Court, the Traders' Bank filed its bill in equity against the surviving assignee of the estate of Dudley C. Hall and Dudley Hall and A. D. McClellan, setting up its right under the conveyance made to McClellan, the bringing of the writ of entry and the fact that the bank had not been made party defendant therein. The bill charged

that the complainant, as a national bank, was entitled to take the conveyance of the real estate to secure the debt of Hall, and that the provisions of the statutes of Massachusetts which were relied on by the assignees were in conflict with sections 5136, 5137, Revised Statutes of the United States. The bill prayed that the assignee and McClellan be permanently enjoined from proceeding under the writ of entry and the exceptions filed therein, and McClellan be ordered to apply the proceeds of the property to the payment of the note and loan secured thereby. After due pleading the issues tendered were reported by the presiding justice for the consideration of the full court upon certain questions of law reserved, and the full court affirmed the verdict of the jury and judgment thereon in the writ of entry case and dismissed the bill in equity.

So far as concerned the Federal question, the court held that there was no conflict between sections 5136, 5137 of the Revised Statutes of the United States, and sections 96 and 98 of chapter 157 of the Public Statutes of Massachusetts. Both cases were brought here by writ of error.

*Mr. Almon A. Strout* and *Mr. William H. Coolidge* for plaintiff in error. *Mr. H. J. Jaquith* was on their brief.

The provisions of sections 96 and 98 of the Massachusetts statute are inconsistent with the letter and spirit of sections 5136 and 5137 of the Revised Statutes of the United States, and tend to impair the operations of a national bank organized thereunder in taking security for its debts, whereby it is enabled to preserve its assets and ensure its stability and efficiency in carrying out the purposes for which it was organized, thereby rendering effectual the end for which these statutes were enacted.

The decisions of the English courts are not in point, owing to the difference of the structure of the two systems of government, and this question, in the precise form in which it is now presented, has never been directly adjudicated in the courts of the United States. But we claim that the principle

involved has been decided in favor of the contention of the plaintiff in error.

In considering the question as to whether there is such inconsistency and conflict as we claim exists, the purposes for which the banking act was passed, and for which national banks were created, are not to be limited by occasional dicta of the courts, but are to be found by considering the objects to be subserved by them.

"National banks are instrumentalities of the Federal government created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a State to define their duties, or control the conduct of their affairs, is absolutely void wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation, or impairs the efficiencies of these agencies of the Federal government to discharge the duties for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court." *Davis* v. *Elmira Savings Bank,* 161 U. S. 275, 283. See also *Waite* v. *Dowley,* 94 U. S. 527; *National Bank* v. *Commonwealth,* 9 Wall. 353; *Gulf, Colorado & Santa Fé Railway* v. *Hefley,* 158 U. S. 98.

In the case at bar the statute of Massachusetts is not in the nature of a police regulation, nor is it a statute prescribing certain forms to be observed in executing the conveyance and making public record thereof. It is rather a statute which goes to the validity of the conveyance made in accordance with the provisions of the statute of the United States, because it is alleged such conveyance was made in violation of certain conditions which the legislature of Massachusetts had declared should render it void if they were disregarded.

At the time of the passage of the national banking act, the finances of the country were in a deplorable condition. There was no uniformity, and so great was the distrust of state banks that in many instances bills which were used in one State were not current in another. Nor could the United States avail themselves of these institutions to carry on the

fiscal operations of the government, and the result was that commerce was impeded, the operations of the national government crippled, and it became absolutely necessary that Congress should establish not only a "stable," but a "uniform," system of currency applicable alike to every State in the Union.

With this end in view, the national banking act was so constructed as to afford security to currency issued by the several banking associations, and it was intended that they should have credit for stability and permanency, not only by depositing the bonds of the United States, but by taking security whenever necessary for the protection of their property and assets. Hence it was that Congress was not satisfied with legislating in a general way upon the manner of doing business by national banking associations, but legislation was had covering the specific question in controversy, and by section 5136 it is declared "That the banking association shall have power. . . . Third, to make contracts. . . . Seventh, All such incidental powers as shall be necessary to carry on the business of banking . . . by loaning money on personal security." And section 5137 provides "That a national banking association may purchase, hold and convey real estate for the following purposes and no other. . . . Second, such as shall be mortgaged to it in good faith by way of security for debts previously contracted. Third, such as shall be conveyed to it in satisfaction of debts contracted in the course of its dealings."

The act further points out the qualifications and disabilities attending such holding, for it says : " But no such association shall hold the possession of any real estate under mortgage or title of possession of any real estate purchased to secure any debt due it for a longer period than five years." This qualification, which was intended to prevent speculation in land, or the accumulation of large amounts of real estate to be held for an indefinite period, is the only restriction which Congress placed upon the power of the national bank to take conveyances of real estate by way of mortgage for the security of debts previously contracted. " *Expressio unius est exclusio alterius.*"

There can be no doubt that, under the provisions of the statute of the United States, the Traders' National Bank could hold this real estate conveyed to one of its directors in trust and mortgage to secure a debt previously contracted in good faith, and even for a debt contracted contemporaneously with the conveyance. This conveyance was valid security for the debt of the bank, unless it is rendered invalid by the laws of the State of Massachusetts. *National Bank* v. *Whitney*, 103 U. S. 99, 102; *National Bank* v. *Matthews*, 98 U. S. 621.

Considering the purposes for which banking associations are organized, and for which the provisions of the national banking act were enacted by Congress, do the provisions of the insolvent law of Massachusetts render void this conveyance and other like conveyances at the will of the assignee appointed by state courts, and under authority of state statutes, by attaching to it conditions which provide that such conveyance shall be void if at any time within six months the bank has reasonable cause to believe that the mortgagor is insolvent or in contemplation of insolvency? In other words, if the bank has reasonable cause to believe that a state of affairs exists which makes it the duty of the bank to take additional security for an existing debt in order to preserve its own assets, and thereby its usefulness in carrying out the purposes of its organization, does such knowledge, at the election of the assignee, who may affirm or repudiate the conveyance, render its efforts to obtain the security provided by the statute without avail? We respectfully contend that such a statute tends to impair the usefulness of national banks, and is in conflict with both the letter and spirit of the act of Congress.

The conveyance to the plaintiff in error was not void at the time it was made, but under the construction given to the state laws of insolvency was only voidable. If the conveyance had been rendered void by the force of the statute, no title would have passed to the purchaser; otherwise if it was voidable at the election of the assignee. If the title passed, then the lien of the United States attached, and the statute of the State of Massachusetts would be inoperative to defeat that lien, because of the insolvency of the grantor.

The knowledge of the bank and the subsequent election of
the assignee to proceed under the state statute for the re-
covery of the property certainly would operate as an impair-
ment of the operation of the statute of the United States
creating a national bank.

.We further respectfully contend that where, as in the
present case, Congress has legislated fully upon a specific
subject-matter, such legislation is exclusive of any legislation
upon the same subject-matter by the several States. Turning
to the statute of the United States, it is difficult to conceive
how Congress could have used language to more fully con-
vey its will in relation to a power of national banks to take
securities for past debts by a conveyance of land, either
directly or in mortgage.

It provides: (1) The kind of security to be taken; (2) The
kind of debt for which security may be taken; namely, a debt
previously contracted; (3) The nature of the conveyance to be
made: that it shall be by way of mortgage security, or in satis-
faction of the debt itself; (4) The conditions and restrictions
to be applied to the conveyance — that it shall be mortgaged
in good faith, or conveyed in satisfaction of debts previously
contracted in the course of its dealings; (5) The length of
time for which the real estate can be held: that it shall not
be for a longer period than five years.

It is clear that if Congress had intended to make these pro-
visions for the taking and holding of real estate subject to
any other conditions, its intention would have been apparent
in additional provisions of the law.

We do not contend that Congress did not contemplate that
the conveyance should be made in accordance with the pro-
visions of the common law, and should conform to the re-
quirements of the statutes of the several States, so far as the
form of conveyance was concerned, and the measures to be
taken to give it publicity; that is to say, it left it still open
to the courts to say who could have priority of security where
there was no notice or record of the mortgage made, and like
questions. But that goes simply to the form, not to the spirit,
of the act and the power of making a conveyance in the

manner prescribed by Congress. There is a wide difference between the two, and that difference is effectual in favor of the contention of the plaintiff in error.

We call attention with confidence to the case of *Davis* v. *Elmira Savings Bank*, 161 U. S. 275. In that case sections 5236 and 5242 of the Revised Statutes of the United States provided for the manner of the distribution of the assets of a national bank by the comptroller of the currency ratably among the creditors; but the State of New York, legislating upon the same subject-matter, provided by state statute for a different method of distribution, and instead of its being distributed ratably among the creditors, it provided for the preferential distribution under the law in certain cases. The court holds that there is a conflict between the spirit and letter of the two statutes, and that therefore the state statute must yield to the provisions of the paramount law.

And, after a full citation of authorities and an exhaustive opinion, the court comes to the conclusion that the statutes of the State of New York conflict in letter and spirit with the statute of the United States, and therefore must yield.

Now, it will be remembered that in section 5136 the language of the statutes may in some sense be called "general"; that is, it enables national banks "to make contracts," "to sue and be sued," "to complain and defend in any court of law and equity as fully as natural persons," "to elect or appoint directors," "to regulate the manner in which its stock shall be transferred," and other general matters relating to the powers of the bank; but when it comes to defining the kind of security that may be taken, the language ceases to be general and becomes specific, and, as has been shown above, every condition necessary to a valid conveyance is prescribed by the terms of the act itself. In this regard it is well said by Mr. Justice Field that in *Cook County Bank* v. *United States*, 107 U. S. 445, "everything essential to the formation of the banks, the issue, security and redemption of their notes, and the winding up of the institutions, and the distribution of their assets, are fully provided for."

We respectfully submit to the court that in the case at bar

the provisions of the state law are much more antagonistic to the provisions of the statute of the United States, both in letter and spirit, than they were in the case of *Davis* v. *Elmira Savings Bank.* It might have been argued, and was argued, with equal force in that case, that the provisions of the statute of the United States were general in their character, and that the statute of the United States in making the distribution must have regard to the provisions of the state statute which gave savings banks, in certain cases, a preference. But the court held otherwise, and declared that there was a conflict in spirit, as well as in letter, between the two acts. How much more in the present case is there such conflict? As has been shown above, the provisions of the statute of the United States were not merely general but were specific in relation to security in land which a national bank might take and hold. The provisions of the state statute, if it is operative, forbid such holding in the cases pointed out in the insolvent law.

*Mr. William B. French* for defendants in error.

*Mr. S. J. Elder* filed a brief for defendant in error in No. 36.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

Although these two cases were brought here by separate writs of error, they depend on the same facts and involve the same legal question, and were passed upon by the court below in one opinion. 159 Mass. 363. We shall, therefore, consider them together.

The only Federal question for our consideration is whether there was conflict between the statutes of the United States and the provisions of the general law of the State of Massachusetts referred to and heretofore fully set out. Two propositions have been long since settled by the decisions of this court:

First. National banks "are subject to the laws of the State, and are governed in their daily course of business far more by

the laws of the State than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." *National Bank* v. *Commonwealth*, 9 Wall. 362.

Second. "National banks are instrumentalities of the Federal government created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a State to define their duties, or control the conduct of their affairs, is absolutely void, whenever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation, or impairs the efficiencies of these agencies of the Federal government to discharge the duties for the performance of which they were created." *Davis* v. *Elmira Savings Bank*, 161 U. S. 275, 283.

These two propositions, which are distinct, yet harmonious, practically contain a rule and an exception, the rule being the operation of general state laws upon the dealings and contracts of national banks, the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge the duties imposed upon them by the law of the United States. The provisions of the statutes of the United States upon which the plaintiffs in error rely are as follows:

"A national banking association may purchase, hold and convey real estate for the following purposes, and for no others:

\* \* \* \* \*

"Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.

"Third. Such as shall be conveyed to it in satisfaction of

debts previously contracted in the course of its dealings." Rev. Stat. § 5137.

The argument is that as this statute permits national banks to take real estate for given purposes, therefore the Massachusetts law which forbids a transfer of property, with a view to a preference, in case of insolvency, where the transferee has reasonable cause to believe that the transferrer is insolvent or in contemplation of insolvency, in no way controls the contracts or dealings of a national bank. But this position denies the general rule just referred to, and amounts to asserting that in every case where a national bank is empowered to make a contract, such contract is not subject to the state law. In the case in hand there is no express conflict between the grant of power by the United States to the bank to take real estate for previous debts, and the provisions of the Massachusetts law, which, although allowing as a general rule the taking of real estate, as a security for an antecedent debt, provides that it cannot be done under particular and exceptional circumstances. Nor is there anything in the statutes of the State of Massachusetts, here considered, which in any way impairs the efficiency of national banks or frustrates the purpose for which they were created. No function of such banks is destroyed or hampered by allowing the banks to exercise the power to take real estate, provided only they do so under the same conditions and restrictions to which all the other citizens of the State are subjected, one of which limitations arises from the provisions of the state law which in case of insolvency seeks to forbid preferences between creditors. Of course, in the broadest sense, any limitation by a State on the making of contracts is a restraint upon the power of a national bank within the State to make such contracts; but the question which we determine is whether it is such a regulation as violates the act of Congress. As well might it be contended that any contract made by a national bank, within a State in violation of the state laws on the subject of minority or coverture, was valid because such state laws were in conflict with the act of Congress or impaired the power of the bank to perform its functions. Indeed, reduced to its last analysis, the

position here assumed by the plaintiff in error amounts to the assertion that national banks in virtue of the act of Congress are entirely removed, as to all their contracts, from any and every control by the state law.   The argument that the concession of a right on the part of a State to forbid the taking of real estate by a national bank for an antecedent debt, under any circumstance, implies the existence of a power in the State to forbid such taking in all cases, begs the question, and amounts simply to a restatement of the proposition already answered.   As long since settled in the cases already referred to, the purpose and object of Congress in enacting the national bank law was to leave such banks as to their contracts in general under the operation of the state law, and thereby invest them as Federal agencies with local strength, whilst, at the same time, preserving them from undue state interference wherever Congress within the limits of its constitutional authority has expressly so directed, or wherever such state interference frustrates the lawful purpose of Congress or impairs the efficiency of the banks to discharge the duties imposed upon them by the law of the United States.

It is said that section 98 of the Massachusetts statute is in conflict with the statutes of the United States in so far as it provides that, " If such sale, assignment, transfer or conveyance is not made in the usual and ordinary course of business of the debtor, that fact shall be *prima facie* evidence of such cause of belief," that is, the belief on the part of the creditor of the insolvency of the debtor by whom the transaction was made.   The reasoning is that as the United States law allows the taking by a bank of real estate for an antecedent debt, and the state statute makes such taking of real estate *prima facie* evidence of a reasonable belief on the part of the bank of the insolvency of the debtor from whom the real estate is so taken, therefore the state law violates the national bank law, since it attributes to the doing of the act which the national bank law authorizes, a presumption which virtually annuls the contract, unless proof be made to the contrary.   But this view gives to the words " ordinary course of business " in the state statute a strained and unreasonable con-

struction. The state statute does not provide that the mere fact that a security is taken for an antecedent debt renders the contract one not in the actual course of the debtor's business, thereby engendering the presumption of knowledge on the part of the creditor, but affixes such presumption only to cases where the particular nature of the dealings between the parties is such as to make the contract not one in the actual course of business, from which fact the statutory presumption arises. However, this objection does not arise on the record before us, since the Supreme Court of Massachusetts held that the effect of the charge of the trial court was substantially to instruct the jury that before the plaintiff in the entry suit could recover he must satisfy the jury by a preponderance of evidence that Hall at the time of the conveyance was insolvent.

The claim that the security vested in the bank by the conveyance of the land is taken away from it in violation of the United States law, because, under the Massachusetts law, a contract by a debtor giving a fraudulent preference to one creditor over another, is voidable and not void, is without merit. This contention concedes that if the state law rendered the transaction void there would be a valid exercise of state authority. But the power to do the greater necessarily carries with it the right to do the lesser. Nor is there anything in the opinion of this court in *Davis* v. *Elmira Savings Bank, supra,* which supports the argument of the plaintiff in error. There, the conflict between the state and the Federal law was found to be express and irreconcilable, bringing that case, therefore, under the exception to the general rule. The opinion carefully confined the ruling there made to such a case, so as to render it inapplicable in a case like the one now before it. It said:

"It is certain that, in so far as not repugnant to acts of Congress, the contracts and dealings of national banks are left subject to the state law, and upon this undoubted premise, which nothing in this opinion gainsays."

And the whole opinion was qualified by this language:

"Nothing, of course, in this opinion is intended to deny the

operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not con-flict with the letter or the object and purposes of Congressional legislation."

Finding no conflict between the special power conferred by Congress upon national banks to take real estate for certain purposes, and the general and undiscriminating law of the State of Massachusetts subjecting the taking of real estate to certain restrictions, in order to prevent preferences in case of insolvency, we conclude that the judgments of the Supreme Court of the State of Massachusetts were right, and they are, therefore, in both cases,

*Affirmed.*