***PRELIMINARY PRINT***

## VOLUME 602 U. S. PART 1

PAGES 205–221

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MAY 30, 2024

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

CANTERO ET AL., INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED *v.* BANK OF
AMERICA, N. A.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

No. 22–529.   Argued February 27, 2024—Decided May 30, 2024

The United States maintains a dual system of banking.   Banks with federal charters—called national banks—are subject primarily to federal oversight and regulation.   Banks with state charters are subject to additional state oversight and regulation.   As relevant here, the National Bank Act expressly grants national banks the power to administer home mortgage loans.   12 U. S. C. §371(a).   When national banks make home mortgage loans, they often offer escrow accounts designed to protect both the bank and the borrower.   Escrow accounts ensure the availability of funds to pay the insurance premium and property taxes on the borrower's behalf.   Escrow accounts operated by national banks are extensively regulated by the Real Estate Settlement Procedures Act of 1974.   RESPA was designed to protect borrowers from "certain abusive practices" that were being carried on by national banks.   §2601(a). But RESPA does not mandate that national banks pay interest to borrowers on the balances of their escrow accounts.   New York state law is different.   It provides that a bank "shall" pay borrowers "interest" on the balance held in an escrow account maintained in connection with a mortgage on certain real estate.   N. Y. Gen. Oblig. Law Ann. §5–601.

  In this case, petitioner Alex Cantero and petitioners Saul Hymes and Ilana Harwayne-Gidansky obtained home mortgage loans from Bank of America, a national bank chartered under the National Bank Act.   Both contracts required the borrowers to make monthly deposits into escrow accounts.   Bank of America did not pay interest on the balances held in either escrow account, but informed the borrowers that the New York interest-on-escrow law was preempted by the National Bank Act.   The borrowers brought putative class-action suits in Federal District Court. The District Court concluded that nothing in the National Bank Act or other federal law preempted the New York law.   The Second Circuit reversed, holding that because the New York law "would exert control over" national banks' power "to create and fund escrow accounts," the law was preempted.

*Held*: The Second Circuit failed to analyze whether New York's interest-on-escrow law is preempted as applied to national banks in a manner consistent with Dodd-Frank and *Barnett Bank*. Pp. 213–221.

(a) Congress has instructed courts how to analyze federal preemption of state laws regulating national banks in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Dodd-Frank ruled out field preemption. Instead, Dodd-Frank provides that the National Bank Act preempts a state law "only if" the state law (i) discriminates against national banks as compared to state banks; or (ii) "prevents or significantly interferes with the exercise by the national bank of its powers," as determined "in accordance with the legal standard for preemption" in the Court's decision in *Barnett Bank of Marion Cty., N. A.* v. *Nelson*, 517 U. S. 25. §§ 25b(b)(1)(A), (B). Because the New York law does not discriminate against national banks, the preemption question must be analyzed under Dodd-Frank's "prevents or significantly interferes" preemption standard "in accordance with" *Barnett Bank*. Pp. 213–219.

(1) In *Barnett Bank*, a dispute arose because a national bank wanted to sell insurance in a Florida small town, but the State prohibited most banks from selling insurance. The Court held the Florida law preempted because it significantly interfered with the national bank's ability to sell insurance—a federally authorized power. Importantly, *Barnett Bank* made clear that a non-discriminatory state banking law can be preempted even if it is possible for the national bank to comply with both federal and state law. 517 U. S., at 31. The Court reasoned that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Id.*, at 33. But the Court added that its ruling did not "deprive States of the power to regulate national banks, where (unlike here) doing so does not prevent or significantly interfere with the national bank's exercise of its powers." *Ibid.* Pp. 214–215.

(2) *Barnett Bank* did not purport to establish a clear line to demarcate when a state law "significantly interfere[s]" with a national bank's ability to exercise its powers. 517 U. S., at 33. Instead, the Court analyzed its precedents on that issue, looking to prior cases where the state law was preempted and where the state law was not preempted. Given Dodd-Frank's direction to identify significant interference "in accordance with" *Barnett Bank*, courts addressing preemption questions in this context must do the same and likewise take account of those prior decisions. § 25b(b)(1)(B). The paradigmatic example of significant interference identified by *Barnett Bank* occurred in *Franklin National Bank of Franklin Square* v. *New York*, 347 U. S. 373, where a New York law prohibiting most banks "from using the word 'saving' or 'savings'

in their advertising or business" was held preempted because it interfered with the national bank's statutory power "to receive savings deposits." *Id.*, at 374, 378–379. The Court in *Franklin* found the New York law preempted—even though it did not bar national banks from receiving (or even advertising) savings deposits—because the New York law interfered with the banks' ability to advertise "using the commonly understood description which Congress has specifically selected." *Id.*, at 378. *Barnett Bank* also pointed to a second example of significant interference—*Fidelity Federal Savings & Loan Association* v. *De la Cuesta*, 458 U. S. 141—where the state law similarly limited a federally authorized power. For purposes of applying Dodd-Frank's preemption standard, *Franklin*, *Fidelity*, and *Barnett Bank* together illustrate the kinds of state laws that significantly interfere with the exercise of a national bank power and thus are preempted. Pp. 215–217.

(3) The primary example of a case identified in *Barnett Bank* where state law was not preempted is *Anderson National Bank* v. *Luckett*, 321 U. S. 233. There, a Kentucky law required banks to turn over abandoned deposits to the State. The *Anderson* Court held that the Kentucky law did not interfere with national banks' federal power to collect deposits because that power includes the inseparable "obligation to pay" deposits to those "entitled to demand payment." *Id.*, at 248–249. *Anderson* distinguished a similar California law at issue in *First National Bank of San Jose* v. *California*, 262 U. S. 366, where the Court had found the state law to be preempted, and its reasons for differentiating the California law help demonstrate when a state law regulating national banks crosses the line from permissible to preempted. In contrast to the Kentucky law in *Anderson*, the California law in *First National Bank of San Jose* allowed the State to claim dormant deposits without proof of abandonment. The Court noted that California's law could therefore cause customers to "hesitate" before depositing funds at the bank—and thus interfere with the "efficiency" of the national bank in receiving deposits. 262 U. S., at 369–370. *Barnett Bank* also cited two other examples of state laws that were not preempted, both of which regulated banks in "their daily course of business." See *National Bank* v. *Commonwealth*, 9 Wall. 353; *McClellan* v. *Chipman*, 164 U. S. 347. Pp. 217–219.

(b) The Court's precedents applying *Barnett Bank* furnish content to the significant-interference test—and therefore also to Dodd-Frank's preemption standard incorporating *Barnett Bank*. A court applying that standard must make a practical assessment of the nature and degree of the interference caused by a state law. If the state law's interference with national bank powers is more akin to the interference in cases like *Franklin*, *Fidelity*, *First National Bank of San Jose*, and

Syllabus

*Barnett Bank*, then the state law is preempted. But if the state law's interference with national bank powers is more akin to the interference in cases like *Anderson*, *National Bank*, and *McClellan*, then the state law is not preempted. In this case, the Second Circuit did not conduct the kind of nuanced comparative analysis required by *Barnett Bank*, but instead distilled a categorical test that would preempt virtually all state laws that regulate national banks. Congress expressly incorporated *Barnett Bank* into Dodd-Frank, and *Barnett Bank* did not draw a bright preemption line. The Court of Appeals must conduct a preemption analysis in a manner consistent with that standard. Pp. 219–221.

49 F. 4th 121, vacated and remanded.

KAVANAUGH, J., delivered the opinion for a unanimous Court.

*Jonathan E. Taylor* argued the cause for petitioners. With him on the briefs were *Deepak Gupta, Gregory A. Beck, Hassan Zavareei, Anna C. Haac, Jonathan M. Streisfeld, Mark C. Rifkin,* and *Matthew M. Guiney.*

*Deputy Solicitor General Stewart* argued the cause for the United States as *amicus curiae* supporting vacatur. With him on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Charles L. McCloud, Gerard Sinzdak,* and *Urja Mittal.*

*Lisa S. Blatt* argued the cause for respondent. With her on the brief were *Enu Mainigi, Sarah M. Harris, Aaron Z. Roper, Mark W. Mosier,* and *Kendall T. Burchard.**

———————

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Letitia James,* Attorney General of New York, *Barbara D. Underwood,* Solicitor General, *Andrea Oser,* Deputy Solicitor General, and *Sarah L. Rosenbluth,* Assistant Solicitor General, by *Brenna Bird,* Attorney General of Iowa, and *Eric H. Wessan,* Solicitor General, and by the Attorneys General for their respective jurisdictions as follows: *Treg Taylor* of Alaska, *Kris Mayes* of Arizona, *Rob Bonta* of California, *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Kathleen Jennings* of Delaware, *Brian L. Schwalb* of the District of Columbia, *Christopher M. Carr* of Georgia, *Anne E. Lopez* of Hawaii, *Kwame Raoul* of Illinois, *Theodore E. Rokita* of Indiana, *Kris Kobach* of Kansas, *Aaron M. Frey* of Maine, *Anthony G. Brown* of Maryland, *Andrea Joy Campbell* of Massachusetts, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Austin Knudsen* of Montana, *Michael T. Hilgers* of Nebraska, *Aaron D. Ford* of Nevada, *Matthew J. Platkin* of New Jersey, *Joshua H. Stein* of North

Opinion of the Court

JUSTICE KAVANAUGH delivered the opinion of the Court.

Federal law extensively regulates national banks such as Bank of America and expressly preempts some (but not all) state laws that regulate national banks. This case concerns the standard for determining when state laws that regulate national banks are preempted. As relevant here, the Dodd-Frank Act of 2010 expressly incorporated the standard that this Court articulated in *Barnett Bank of Marion County, N. A.* v. *Nelson*, 517 U. S. 25 (1996). 12 U. S. C. § 25b(b)(1)(B). That standard asks whether a state law "prevents or significantly interferes with the exercise by the national bank of its powers." *Ibid.* Because the Court of Appeals in this case did not apply that standard in a manner consistent with Dodd-Frank and *Barnett Bank*, we vacate and remand.

## I

## A

The United States maintains a dual system of banking, made up of parallel federal and state banking systems.

Carolina, *Gentner Drummond* of Oklahoma, *Ellen F. Rosenblum* of Oregon, *Michelle A. Henry* of Pennsylvania, *Peter F. Neronha* of Rhode Island, *Marty J. Jackley* of South Dakota, *Ken Paxton* of Texas, *Sean D. Reyes* of Utah, *Charity R. Clark* of Vermont, *Robert W. Ferguson* of Washington, and *Bridget Hill* of Wyoming; for the Conference of State Bank Supervisors et al. by *Stefan L. Jouret* and *Arthur E. Wilmarth, Jr.*; for the Constitutional Accountability Center by *Elizabeth B. Wydra* and *Brianne J. Gorod*; for Flagstar Plaintiffs by *Steve W. Berman, Thomas E. Loeser, Kevin K. Green*, and *Peter B. Fredman*; and for Public Citizen et al. by *Adina H. Rosenbaum* and *Allison M. Zieve.*

Briefs of *amici curiae* urging affirmance were filed for the Bank Policy Institute et al. by *H. Rodgin Cohen, Matthew A. Schwartz*, and *Thomas Pinder*; for the Chamber of Commerce of the United States of America by *Shay Dvoretzky, Parker Rider-Longmaid, Jonathan D. Urick*, and *Tyler S. Badgley*; for Flagstar Bank, N. A., by *Jonathan Y. Ellis, Brian D. Schmalzbach*, and *Thomas M. Hefferon*; for Former Comptrollers of the Currency et al. by *William M. Jay*; for the Washington Legal Foundation by *John M. Masslon II* and *Cory L. Andrews*; for Dori K. Bailey by *Louis Orbach*; and for Joseph R. Mason by *Anton Metlitsky* and *Jenya Godina.*

That dual system allows privately owned banks to choose whether to obtain a charter from the Federal Government or from a state government.

Banks with federal charters, called national banks, are subject primarily to federal oversight and regulation. And banks with state charters, called state banks, are subject to additional state oversight and regulation. Those two banking systems co-exist and compete.

The national banking system began in 1863 when Treasury Secretary (later Chief Justice) Salmon Chase proposed, Congress passed, and President Lincoln signed the National Bank Act. 12 Stat. 665; 13 Stat. 99. When a bank obtains a federal charter under the National Bank Act, the national bank gains various enumerated and incidental powers. 12 U. S. C. §24. The National Bank Act expressly affords national banks the powers that they need to organize and operate—for example, the powers to "make contracts," to "sue and be sued," and to "elect or appoint" a "board of directors." *Ibid.* The Act also provides national banks with banking-specific powers. As relevant here, the Act expressly supplies national banks with the power to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate"—in other words, to administer home mortgage loans. §371(a). The Act also expressly authorizes national banks to exercise "all such incidental powers as shall be necessary to carry on the business of banking." §24.

When national banks make home mortgage loans, they often offer escrow accounts. Mortgage-escrow accounts are designed to protect both the bank and the borrower. When the borrower makes a mortgage payment, the borrower puts money into an escrow account operated by the bank; the bank then uses the funds in escrow to pay the borrower's insurance premium and property taxes on the borrower's behalf. That arrangement helps the borrower by simplifying expenses and budgeting. Instead of having to pay large

lump-sum insurance and tax payments once or twice a year, the borrower can instead make small payments throughout the year. And the arrangement also assists the bank by ensuring that the borrower's insurance and tax bills are timely paid, thus protecting the loan collateral (the home) against tax foreclosure or uninsured damage.

In light of those benefits to both sides, the vast majority of home mortgages come with escrow accounts. Indeed, many federal agencies and programs require them. The Federal Housing Administration and the Department of Agriculture's Rural Housing Service, for example, mandate escrow accounts for mortgages that they administer or insure.

In the 1970s, Congress found that some national banks were engaging in "certain abusive practices" and that "significant reforms" were necessary to protect borrowers. 12 U. S. C. §2601(a). To that end, Congress passed and President Ford signed the Real Estate Settlement Procedures Act of 1974, or RESPA. Among other things, RESPA extensively regulates national banks' operation of escrow accounts. RESPA first sets out the general terms for national banks that operate escrow accounts. For example, RESPA requires national banks to "promptly retur[n] to the borrower" any funds left over after the loan is paid, §2605(g), and to provide borrowers with notifications and account statements, §§2609(b), (c). RESPA also contains a specific safeguard for borrowers: It caps the amount that national banks can require borrowers to deposit into escrow accounts. §2609(a). But as relevant to this case, RESPA (unlike New York law, as we will discuss) does not mandate that national banks pay interest to borrowers on the balances of their escrow accounts.[1]

_____

[1] Another federal law, the Truth in Lending Act, also addresses national banks' operation of mortgage-escrow accounts. The Truth in Lending Act requires national banks to operate escrow accounts for certain mortgages. 82 Stat. 146, 15 U. S. C. §1639d. For those mandatory escrow accounts, the national bank must "pay interest" to the borrower "in the manner as

B

Bank of America is a national bank chartered under the National Bank Act. Bank of America offers mortgage loans to homeowners, among other services.

In 2010, Alex Cantero obtained a home mortgage loan from Bank of America to purchase a house in Queens Village, New York. In 2016, Saul Hymes and Ilana Harwayne-Gidansky similarly obtained a home mortgage loan from Bank of America to buy a house in East Setauket, New York. Both mortgage contracts required the borrowers to make monthly deposits into escrow accounts, which Bank of America used to pay the borrowers' property taxes and insurance premiums when those taxes and premiums came due.

Under New York law, when a bank "maintains an escrow account pursuant to any agreement executed in connection with a mortgage" on certain real estate, the bank "shall" pay borrowers "interest at a rate of not less than two per centum per year" on the balance. N. Y. Gen. Oblig. Law Ann. § 5–601 (West 2022). But Bank of America did not pay interest on the money in Cantero's escrow account or Hymes and Harwayne-Gidansky's escrow account. Bank of America notified the borrowers that the New York law was preempted by the National Bank Act. Both plaintiffs brought putative class-action suits against Bank of America in the U. S. District Court for the Eastern District of New York, alleging that Bank of America violated New York law by failing to pay them interest on the balances in their escrow accounts.

The District Court decided the two cases together. The court agreed with the plaintiffs that New York law required Bank of America to pay interest on the escrow account balances. The court ruled that the New York interest-on-escrow law applied to national banks such as Bank of America, concluding that nothing in the National Bank Act

---

prescribed by [an] applicable State or Federal law." § 1639d(g)(3). All parties agree that § 1639d does not apply to the mortgages in this case.

or other federal law preempted the New York law. *Hymes* v. *Bank of America, N. A.*, 408 F. Supp. 3d 171, 198 (EDNY 2019).

The U. S. Court of Appeals for the Second Circuit reversed, holding that the New York interest-on-escrow law was preempted as applied to national banks. Relying primarily on "an unbroken line of case law since *McCulloch* [v. *Maryland*, 4 Wheat. 316 (1819)]," the Court of Appeals held that federal law preempts any state law that "purports to exercise control over a federally granted banking power," regardless of "the magnitude of its effects." 49 F. 4th 121, 131 (2022). Because the New York interest-on-escrow law "would exert control over" national banks' power "to create and fund escrow accounts," the court concluded that the law was preempted. *Id.*, at 134.

This Court granted certiorari. 601 U. S. —— (2023).

## II

Congress has instructed courts how to analyze federal preemption of state laws regulating national banks. In the wake of the 2008 financial crisis, Congress passed and President Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Pub. L. 111–203, 124 Stat. 1376. Among other things, Dodd-Frank established the controlling legal standard for when a "State consumer financial law," like New York's interest-on-escrow law, is preempted with respect to national banks. 12 U. S. C. §25b.

To begin, Dodd-Frank ruled out field preemption. §25b(b)(4) (federal banking law "does not occupy the field in any area of State law"). As a result, we know that not all state laws regulating national banks are preempted.

Instead, Dodd-Frank provided, as relevant here, that the National Bank Act preempts a state law "only if" the state law (i) discriminates against national banks as compared to state banks; or (ii) "prevents or significantly interferes with the exercise by the national bank of its powers," as deter-

mined "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996)." §§ 25b(b)(1)(A), (B).

New York's interest-on-escrow law does not discriminate against national banks. The question of whether New York's interest-on-escrow law is preempted therefore must be analyzed under Dodd-Frank's "prevents or significantly interferes" preemption standard. To guide judicial application of that preemption standard, Dodd-Frank expressly incorporates this Court's decision in *Barnett Bank*. The preemption question here therefore must be decided "in accordance with" *Barnett Bank*, as Dodd-Frank directs. § 25b(b)(1)(B).[2]

## A

In *Barnett Bank*, a Florida law prohibited most banks from selling insurance. *Barnett Bank of Marion Cty., N. A.* v. *Nelson*, 517 U. S. 25, 29 (1996). A dispute arose because federal law authorized national banks to sell insurance in small towns, and a national bank wanted to sell insurance in a small Florida town. *Id.*, at 28–29.

This Court held that the Florida law was preempted because the law significantly interfered with the national bank's ability to exercise a power—selling insurance—authorized by federal law. *Id.*, at 33–35. Importantly, *Barnett Bank* made clear that a non-discriminatory state banking law can be preempted even if it is possible for the national bank to comply with both federal and state law—

─────────

[2] Cantero's mortgage agreement (unlike Hymes and Harwayne-Gidansky's mortgage agreement) was signed after Dodd-Frank was enacted but before Dodd-Frank became effective. Because we conclude that Dodd-Frank adopted *Barnett Bank*, and because *Barnett Bank* was also the governing preemption standard before Dodd-Frank, the timing of Cantero's mortgage agreement does not affect the preemption analysis here.

there, by declining to sell insurance. *Id.*, at 31. The Court emphasized that federal law's "grants of both enumerated and incidental 'powers' to national banks" are "grants of authority not normally limited by, but rather ordinarily preempting, contrary state law." *Id.*, at 32. Congress had afforded national banks a "broad, not a limited," power to sell insurance—a power "without relevant qualification." *Ibid.* The Court reasoned that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Id.*, at 33. Because federal law "explicitly grant[ed] a national bank an authorization, permission, or power" with "no indication that Congress intended to subject that power to local restriction," the Court concluded that state law could not limit national banks' ability to sell insurance. *Id.*, at 34–35 (internal quotation marks omitted); see *id.*, at 37. But the Court added that its ruling did not "deprive States of the power to regulate national banks, where (unlike here) doing so does not prevent or significantly interfere with the national bank's exercise of its powers." *Id.*, at 33.

In short, *Barnett Bank* decided that the nondiscriminatory Florida law at issue there significantly interfered with the bank's exercise of its powers, and thus was preempted.

B

But *Barnett Bank* did not purport to establish a clear line to demarcate when a state law "significantly interfere[s] with the national bank's exercise of its powers." *Ibid.* Instead, the Court analyzed the Court's precedents on that issue. Specifically, to determine whether the Florida law was preempted, *Barnett Bank* looked to prior cases of this Court where the state law was preempted, as well as several cases where the state law was not preempted. Given Dodd-Frank's direction to identify significant interference "in accordance with" *Barnett Bank*, courts addressing preemption questions in this context must do as *Barnett Bank* did and

likewise take account of those prior decisions of this Court and similar precedents.    § 25b(b)(1)(B).

The paradigmatic example of significant interference identified by *Barnett Bank* occurred in *Franklin National Bank of Franklin Square* v. *New York*, 347 U. S. 373 (1954).   The New York law at issue in *Franklin* prohibited most banks "from using the word 'saving' or 'savings' in their advertising or business."   *Id.*, at 374.   The *Franklin* Court concluded that the law was preempted because it interfered with the national bank's statutory power "to receive savings deposits."   *Id.*, at 374, 378–379.   Importantly, the New York law did not bar national banks from receiving savings deposits, "or even" from "advertising that fact."   *Id.*, at 378.   Nonetheless, the Court determined that the New York law significantly interfered with the banks' power because the banks could not advertise effectively "using the commonly understood description which Congress has specifically selected" to describe their activities: receiving savings deposits.   *Ibid.*   Federal law gave national banks the power not only "to engage in a business," but also "to let the public know about it"—and state law could not interfere with the national bank's ability to do so efficiently.   *Id.*, at 377–378.

In *Barnett Bank*, the Court compared the Florida insurance law at issue there to the New York savings-deposit law at issue in *Franklin*, and the Court concluded that the two state laws were "quite similar."   517 U. S., at 33.   Because the Florida law interfered with the national bank's power in a way similar to the New York law in *Franklin*, the Florida law was preempted.

*Barnett Bank* also pointed to a second example of significant interference—*Fidelity Federal Savings & Loan Association* v. *De la Cuesta*, 458 U. S. 141 (1982).   In *Fidelity*, federal law allowed, but did "not compel, federal savings and loans to include due-on-sale clauses in their contracts."   *Id.*, at 155.   But California law "limited" that right to circumstances where the federal savings and loan association could

make a showing that enforcing the due-on-sale clause was reasonably necessary. *Id.*, at 154–155; see also *id.*, at 149. The federal savings and loan association could readily comply with both the state and federal laws. *Id.*, at 155. Still, the Court ruled that the California law was preempted because the savings and loan could not exercise a due-on-sale clause "solely at its option." *Ibid.* (internal quotation marks omitted). The California law thus interfered with "the flexibility given" to the savings and loan by federal law. *Ibid.* (internal quotation marks omitted).

For purposes of applying Dodd-Frank's preemption standard, *Franklin*, *Fidelity*, and *Barnett Bank* together illustrate the kinds of state laws that significantly interfere with the exercise of a national bank power and thus are preempted.

C

Of course, not all state laws regulating national banks are preempted. As relevant here, Dodd-Frank preempts a state law "only if" it "prevents or significantly interferes with" national bank powers. §25b(b)(1)(B). To determine the kinds of state-law interference that are not "significant" and that are therefore not preempted, *Barnett Bank* again scoured this Court's precedents.

First, *Barnett Bank* cited *Anderson National Bank* v. *Luckett*, 321 U. S. 233 (1944), as the primary example of a case where state law was not preempted. There, Kentucky law required banks to turn over abandoned deposits to the State. *Id.*, at 236. The *Anderson* Court stated that the Kentucky law did "not infringe or interfere with any authorized function of the bank." *Id.*, at 249. Even though national banks possess a federal power to collect deposits, "an inseparable incident" of that power is the "obligation to pay" the deposits "to the persons entitled to demand payment according to the law of the state where it does business." *Id.*, at 248–249. And Kentucky law simply allowed the State to "demand payment of the accounts in the same

way and to the same extent that the depositors could" after the depositors abandoned the account.  *Id.*, at 249.  Therefore, the *Anderson* Court concluded, Kentucky law did not "infringe the national banking laws or impose an undue burden on the performance of the banks' functions."  *Id.*, at 248; see also *id.*, at 249.

*Anderson* distinguished a seemingly similar California law at issue in an earlier case, *First National Bank of San Jose* v. *California*, 262 U. S. 366 (1923), where the Court had found the state law to be preempted.

In *First National Bank of San Jose*, the California law allowed the State to claim deposits that went " 'unclaimed for more than twenty years.' "  *Ibid.*  Unlike Kentucky's law, however, California did not require proof that the account was abandoned.  Rather, the California law "attempt[ed] to qualify in an unusual way agreements between national banks and their customers."  *Id.*, at 370.  Therefore, the Court noted, the California law could cause customers to "hesitate" before depositing funds at the bank—and thus interfere with the "efficiency" of the national bank in receiving deposits.  *Id.*, at 369–370.

*Anderson*'s reasons for differentiating the California law at issue in *First National Bank of San Jose* help demonstrate when a state law regulating national banks crosses the line from permissible to preempted.  In contrast to the California law in *First National Bank of San Jose*, the Kentucky law in *Anderson* demanded proof that the accounts were abandoned—and thus its rule was "as old as the common law itself."  321 U. S., at 251.  So the Kentucky law could produce no such deterrent effect—and it could apply to national banks.  *Id.*, at 252.

*Barnett Bank* also cited two other examples of state laws that could apply to national banks.  In *National Bank* v. *Commonwealth*, 9 Wall. 353 (1870), the Court determined that a Kentucky tax law was not preempted.  The Kentucky law at issue there taxed the shareholders of all banks (includ-

ing national banks) on their shares of bank stock. *Id.*, at 360. The Court explained that national banks are "exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions" that federal law authorizes them to perform. *Id.*, at 362. But national banks are not "wholly withdrawn from the operation of State legislation"; rather, they remain subject to state law governing "their daily course of business" such as generally applicable state contract, property, and debt-collection laws. *Id.*, at 361–362. Because the Kentucky tax "in no manner hinder[ed]" the national bank's banking operations, and produced "no greater interference with the functions of the bank than any other" law governing businesses, the law was not preempted. *Id.*, at 362–363.

For similar reasons, the Court in *McClellan* v. *Chipman*, 164 U. S. 347 (1896), another example cited by *Barnett Bank*, concluded that a generally applicable Massachusetts contract law was not preempted as applied to national banks. 164 U. S., at 357–358, 361. The Court noted that a generally applicable contract law like Massachusetts's could be said to act as "a restraint upon the power of a national bank within the State to make such contracts." *Id.*, at 358. But even so, such state laws could apply to national banks as long as the state laws did not "in any way impai[r] the efficiency of national banks or frustrat[e] the purpose for which they were created." *Ibid.*

## III

In sum, *Barnett Bank* examined this Court's precedents to determine whether a state law regulating national banks falls on the permissible or preempted side of the significant-interference line. Those precedents furnish content to *Barnett Bank*'s significant-interference test—and therefore also to Dodd-Frank's preemption standard incorporating *Barnett Bank*.

A court applying that *Barnett Bank* standard must make a practical assessment of the nature and degree of the inter-

ference caused by a state law.   If the state law prevents or
significantly interferes with the national bank's exercise of
its powers, the law is preempted.   If the state law does not
prevent or significantly interfere with the national bank's ex-
ercise of its powers, the law is not preempted.   In assessing
the significance of a state law's interference, courts may con-
sider the interference caused by the state laws in *Barnett
Bank*, *Franklin*, *Anderson*, and the other precedents on
which *Barnett Bank* relied.   If the state law's interference
with national bank powers is more akin to the interference
in cases like *Franklin*, *Fidelity*, *First National Bank of San
Jose*, and *Barnett Bank* itself, then the state law is pre-
empted.   If the state law's interference with national bank
powers is more akin to the interference in cases like *Ander-
son*, *National Bank* v. *Commonwealth*, and *McClellan*, then
the state law is not preempted.[3]

In analyzing the New York interest-on-escrow law at issue
here, the Court of Appeals did not conduct that kind of nu-
anced comparative analysis.   Instead, the Court of Appeals
relied on a line of cases going back to *McCulloch* v. *Mary-
land* to distill a categorical test that would preempt virtually

---

[3] In *Barnett Bank* and each of the earlier precedents, the Court reached
its conclusions about the nature and degree of the state laws' alleged inter-
ference with the national banks' exercise of their powers based on the text
and structure of the laws, comparison to other precedents, and common
sense.   See, *e.g.*, *Barnett Bank of Marion Cty., N. A.* v. *Nelson*, 517 U. S.
25, 33–35 (1996) (comparing Florida law at issue to New York law in
*Franklin*); *Franklin National Bank of Franklin Square* v. *New York*, 347
U. S. 373, 378 (1954) (concluding that New York law interfered with ability
to use "a particular label" that federal law "specifically selected"); *First
National Bank of San Jose* v. *California*, 262 U. S. 366, 370 (1923) (reason-
ing that customers "might well hesitate" to subject their deposits to "un-
usual" California law); *Anderson National Bank* v. *Luckett*, 321 U. S. 233,
247–248 (1944) (determining that no "word in the national banking laws . . .
expressly or by implication conflicts with the provisions of  the Kentucky
statutes"); *id.*, at 249–252 (comparing the likely effect of the Kentucky
law to the likely effect of the California law in *First National Bank of
San Jose*).

Opinion of the Court

all state laws that regulate national banks, at least other than generally applicable state laws such as contract or property laws. Bank of America supports the Court of Appeals' approach. By contrast, the plaintiffs would yank the preemption standard to the opposite extreme, and would preempt virtually no non-discriminatory state laws that apply to both state and national banks.

We appreciate the desire by both parties for a clearer preemption line one way or the other. But Congress expressly incorporated *Barnett Bank* into the U. S. Code. And in determining whether the Florida law at issue there was preempted, *Barnett Bank* did not draw a bright line. Instead, *Barnett Bank* sought to carefully account for and navigate this Court's prior bank preemption cases. Applying those precedents, *Barnett Bank* ruled that some (but not all) non-discriminatory state laws that regulate national banks are preempted. Under Dodd-Frank, as relevant here, courts may find a state law preempted "only if," "in accordance with the legal standard" from *Barnett Bank*, the law "prevents or significantly interferes with the exercise by the national bank of its powers." §25b(b)(1)(B).

Because the Court of Appeals did not analyze preemption in a manner consistent with Dodd-Frank and *Barnett Bank*, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.[4]

*It is so ordered.*

_____

[4] During the course of the litigation, the parties have raised two other issues that the Court of Appeals did not address and that it may address as appropriate on remand: first, the significance here (if any) of the preemption rules of the Office of the Comptroller of the Currency; and second, the relevance here (if any) of the Dodd-Frank provision that preempts state consumer financial laws if a federal law "other than title 62 of the Revised Statutes" preempts the state law, 12 U. S. C. §25b(b)(1)(C).

―――――――――――――――――――――――――――――――――――――――――

Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None

―――――――――――――――――――――――――――――――――――――――――